**GREENBERG & RUDMAN LLP**
DAVID H. GREENBERG - State Bar No. 37950
6100 Wilshire Boulevard, Suite 1170
Los Angeles, California 90048
Telephone No.:    (323) 782-0500
Fax No.:          (323) 782-0543

(Additional Counsel Listed Below)

*Attorneys for Plaintiffs, Carl Fielstra III and*
*Krystal Fielstra, on behalf of themselves and*
*all others similarly situated*

FILED

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
RIVERSIDE

2011 JAN 19  PM 3: 13

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

**CV 11 - 00575   PA (JCGx)**

| | |
|---|---|
| Carl Fielstra III and Krystal Fielstra on behalf of themselves and all others similarly situated, | Case No.: _____ |
| Plaintiffs, | **COMPLAINT IN CLASS ACTION** |
| vs. | **DEMAND FOR JURY TRIAL** |
| Uponor, Inc., successor to Uponor North America, Inc., and Radiant Technology, Inc., | |
| Defendants. | |

Plaintiffs Carl and Krystal Fielstra, on behalf of themselves and all others

similarly situated, by and through their undersigned counsel, bring this Complaint in

class action and state and allege as follows:

## THE PLAINTIFFS

1.      Plaintiffs and putative class representatives Carl and Krystal Fielstra

("Plaintiffs") are husband and wife and are the owners of property in Temecula,

California.

2.      Plaintiffs bring this case on behalf of themselves and a class of similarly

- 1 -

situated persons and entities.

## THE DEFENDANTS

3. Defendant Uponor, Inc. is a publicly-held entity that is in the business, among other things, of advertising, warranting, manufacturing, and selling plumbing components.

4. Uponor, Inc. is the successor to Uponor North America, Inc. and is a Minnesota corporation that maintains its principal place of business in Minnesota.

5. Defendant Radiant Technology, Inc. ("RTI") is a foreign entity that is or was in the business, among other things, of advertising, warranting, manufacturing, and selling plumbing components.

6. RTI is or was a wholly owned subsidiary or Uponor. RTI is believed to currently maintain its principle place of business in Minnesota.

7. Uponor and RTI are responsible for some or all of the acts and omissions alleged herein.

8. Uponor and RTI have acted in concert with each other with the respect to the actions and omissions alleged herein.

9. Uponor and RTI are jointly and/or severally liable to Plaintiffs and the putative class members as joint venturers, or in the alternative, operate such that any pretend corporate formalities amongst and between the two should be disregarded or pierced, or in the alternative, are subject to an agency relationship, or in the alternative, are subject to predecessor and successor liability theories, or in the alternative, are otherwise jointly and severally liable for all acts and omissions alleged herein.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over the parties, the putative class, and the causes of action asserted herein pursuant to Rule 23 of the Federal Rules of Civil Procedure and under the Class Action Fairness Act as the amount in controversy exceeds $5 million.

11.    Venue in this forum is proper in that Plaintiffs and the subject property are located in California in this district, some of the putative class members reside in California, the causes of action for the class representatives arose, in part, in California, the causes of action for putative class members arose, in part, in California, and Uponor and RTI transact business within California.

## SUMMARY OF CLASS ACTION

12.    Plaintiffs on behalf of themselves and all other persons and entities similarly situated bring this action for and on behalf of the owners of homes and buildings with Uponor and/or RTI plumbing systems with cross-linked polyethylene ("Pex") tubing as well as any person or entity who has paid for the repairs of or damage caused by such systems. These systems are defective.

13.    Plaintiffs and the putative class members have been damaged as a result of the design, development, advertisement, marketing, sale, and warranty misconduct of Uponor and RTI in connection with Uponor and RTI pex plumbing systems that utilize brass insert fittings.

14.    Uponor and RTI have sold brass insert fittings for pex plumbing systems throughout the United States.

15.    Uponor and RTI warranted and advertised that their pex plumbing systems with brass insert fittings had a lengthy warranty that expressly covered consequential damages arising from leaks or failures in the plumbing systems.

16.    Uponor and RTI have warranted and advertised their brass insert fittings as being "proven," "carefully engineered," "reliable" and resistant to corrosion.

17.    These representations, however, proved untrue and Uponor and RTI's brass insert fittings began to prematurely fail across the country. These failures resulted in substantial damage to property other than the plumbing system.

18.    After selling these brass insert fittings across the country, Uponor now admits that the fittings are "defective," "unreasonably dangerous," and not

merchantable. Uponor and RTI, however, refuse to replace the plumbing systems of all persons and entities who own properties containing the admittedly defective fittings.

19.     The failures of the Uponor and RTI brass insert fittings have and will in the future cause water leaks. These leaks have and will in turn cause extensive damage to other property including the homes and personal property of the owners.

20.     Plaintiffs and the putative class members seek damages arising from and proximately caused by Uponor and RTI's negligence, breach of contract, and breach of warranties. Plaintiffs and the putative class members also seek declaratory and injunctive relief, as described below.

## FACTUAL BACKGROUND

**Uponor and RTI Pex Plumbing Background**

21.     Uponor and RTI sell various plumbing products including pex plumbing systems and their components.

22.     Pex is an acronym for cross-linked polyethylene. Polyethylene is the raw material and the "X" in the generic name "Pex" refers to the cross-linking of the polyethylene across its molecular chains.

23.     For decades, plumbers and homeowners used copper piping for potable water plumbing systems.

24.     Copper is and has been accepted by virtually all plumbing codes throughout the United States.

25.     In the 1980's, manufacturers in the United States began selling and plumbers began installing potable water plumbing systems with tubing made from polybutylene plastic.

26.     Plumbing systems using tubing made from polybutylene plastic were touted by manufacturers as being easier to install, cheaper and longer-lasting than copper plumbing systems.

27.     Polybutylene plumbing systems quickly proved to be poorly conceived,

designed and manufactured systems. Those polybutylene systems began to fail prematurely in the field causing substantial property damage.

28.     A substantial amount of litigation ensued as a result of the widespread, premature failure of polybutylene plumbing systems. Several class actions were filed and settlements in those cases exceeded $1.5 billion.

29.     At least in part in response to the failure of polybutylene plumbing systems, virtually all manufacturers ceased manufacturing polybutylene plumbing systems for sale in the United States. In addition, most plumbing codes eventually prohibited the installation of polybutylene plumbing systems.

30.     Following the demise of polybutylene systems, Uponor, RTI and other companies began selling alternative, non-copper plumbing products in the United States.

31.     Specifically, Uponor and RTI marketed and sold plumbing systems using pex tubing for use in residential and commercial settings.

32.     Uponor and RTI touted their pex plumbing systems as being easier to install, cheaper and longer-lasting than copper plumbing systems.

**Uponor and RTI Pex Brass Insert Fittings**

33.     In approximately 1997, Uponor and/or its parent company purchased RTI. In doing so, Uponor purchased RTI's assets and liabilities, its entire product line and the rights to RTI's intellectual property.

34.     Although RTI was previously involved only in the sale of radiant heating systems, after RTI was acquired by Uponor it began selling a pex plumbing system utilizing brass insert fittings that purportedly conformed to ASTM standard F1807.

35.     F1807 insert fitting systems typically use a crimp or stainless steel clamp connection design in which insert fittings made of brass alloy are inserted into the pex tubing. The brass fittings are secured by using a special tool that crimps copper rings or stainless steel clamps around the outside of the tubing, which in turn,

1    creates a seal between the pex tubing and the brass fittings.

2        36.    The crimp and stainless steel clamp system design used by Uponor and
3 RTI for their pex plumbing systems places a great deal of stress on the brass insert
4 fittings when the system is assembled as intended.

5        37.    The design, choice of material and manufacturing methods of the F1807
6 brass insert fittings also result in residual stress within the fittings following the
7 manufacturing process but before the system is assembled in the field.

8        38.    For some period of time, RTI sold the plumbing components and
9 systems using the F1807 brass insert fittings under its own name or label. However,
10 employees of Uponor, RTI's parent company, also promoted, marketed and sold
11 RTI systems to, for example, the manufactured structures market. These fittings and
12 systems were sold at least in part under the trade name "Plumb-Pex" and the brass
13 fittings sold by Uponor and RTI were identified with "P pex" or "MB pex" stamps.

14        39.    On October 27, 2004, Uponor issued a press release that stated that it
15 would close the RTI operations in early 2005. In that press release, Uponor's
16 executive vice president, Jim Bjork, promised that Uponor "will honor existing RTI
17 and Plasco warranties."

18        40.    By December 2004, Uponor began receiving RTI's inventory, including
19 brass fittings, and began handling the ongoing purchase and distribution of RTI's
20 Plumb-Pex system.

21        41.    Upon information and belief, Uponor closed the RTI operations in early
22 2005 and thereafter continued to sell the F1807 Plumb-Pex fittings and system.

23        42.    Defendants' F1807 fittings are easily identified by a "P-Pex" stamp
24 placed on the brass insert fittings and stainless steel clamps ("SSC"). As Defendants'
25 representatives have admitted at deposition, Defendants' also sold fittings stamped
26 with "MB pex" for use in their F1807 systems.

27        43.    Defendants were negligent in selling these fittings for a number of
28 reasons, including their decision to actively market, promote and sell fittings made

1  from brasses with high zinc content, known as "yellow brass."

2      44.    Defendants knew or should have known that the brass alloy used for the

3  brass insert fittings they sold and marketed made the fittings susceptible to premature

4  failure through various processes like dezincification and stress corrosion cracking.

5      45.    Defendants knew or should have known that the fitting design, pex

6  system design, and choice of brass alloy also made the brass insert fittings

7  susceptible to premature failure through stress corrosion cracking and/or

8  dezincification.

9      46.    Defendants knew or should have known that the manufacturing process

10 used for the brass insert fittings left residual stress and machining imperfections that

11 would cause premature failure through stress corrosion cracking and/or

12 dezincification.

13     47.    The design, materials choices, and manufacturing practices of the brass

14 fittings marketed and sold by Defendants have created a product that is damaged and

15 begins to fail on its first day of use, even if perfectly installed in its intended

16 environment.

17     48.    Because of their defective design and manufacture, Defendants' F1807

18 brass insert fittings failed in their intended purpose.

19     49.    Because of their defective design and manufacture, Defendants' F1807

20 brass insert fittings are inherently defective and are substantially certain to fail within

21 the express warranty provided with the fittings and/or the useful life of the fittings.

22     50.    Plaintiff and Class members own, have installed, or have paid for

23 damages caused by Uponor and RTI plumbing systems with brass insert fittings that

24 have already or are in the process of failing prematurely and thus have suffered or

25 are reasonably certain to suffer actual injury well in advance of the warranted and

26 expected life of their plumbing systems.

27 **Defendants' Admissions of Defect**

28     51.    Although they never told consumers, plumbers, or plumbing distributors

that they were not the designers and manufacturers of the fittings, Defendants now claim that neither Uponor nor RTI actually designed or manufactured the F1807 brass insert fittings they sold to consumers. Defendants instead purchased the fittings from foreign companies, including Unique Industrial Product Company ("Unique Industrial").

52.    No later than 2006, Uponor and RTI began receiving reports that their F1807 fittings were failing prematurely when used as intended.

53.    For example, Defendants received reports from NVR, a large national homebuilder, that numerous F1807 fittings had failed prematurely in homes in the State of Virginia.

54.    Uponor and/or RTI agreed to reimburse NVR for the cost of replacing the fittings and/or plumbing systems in more than seven hundred homes. The cost of those replacements totaled approximately $5 million.

55.    Defendants also received similar reports of prematurely failing F1807 fittings in Minnesota, Wisconsin, Washington, Oregon, Utah, Montana, Missouri, Vermont, Iowa, Michigan, Louisiana, Idaho, Indiana, California and other of the United States.

56.    As a result of the premature failures of the F1807 fittings, Defendants stopped selling F1807 fittings. Uponor now only sells insert fittings manufactured to comply with ASTM F1960 or other ASTM standards.

57.    After deciding to stop selling the Plumb-Pex system, Uponor issued a confidential "talking points" memorandum to its employees and sales representatives. In that memo, Uponor explained the reasons it stopped selling the Plumb-Pex system. Uponor admitted the product design and quality was one of the reasons: "More importantly, the quality and design of the brass insert fitting used in the [Plumb-Pex system] does not measure up to Uponor's high quality standards."

58.    Knowing that these fittings were defective, Uponor allowed its distributors and contractors to return unused Plumb-Pex components for a complete

1  refund in late 2006.

2      59.     At some point in 2006, Uponor sought reimbursement from Unique

3  Industrial for the money Uponor paid as a result of premature failures of the F1807

4  fittings.

5      60.     In seeking reimbursement from Unique Industrial, Uponor claimed that

6  the F1807 fittings it and RTI had obtained from Unique Industrial, and which

7  Uponor and RTI had sold to the public, were defectively designed or manufactured.

8      61.     Ultimately, Uponor sued Unique Industrial in federal court in Texas. In

9  that complaint, Uponor admitted that the F1807 fittings were "defectively

10  manufactured" and "were not merchantable, or suited for their reasonable, expected

11  and intended use in residential plumbing systems, and which were not free from

12  defects in materials, design and workmanship."

13     62.     Uponor also admitted in the complaint against Unique Industrial that the

14  F1807 fittings were "defective and unreasonably dangerous." A copy of the Uponor

15  Amended Complaint is attached as Exhibit A.

16     63.     In the course of its lawsuit against Unique Industrial for the premature

17  failures of the F1807 fittings, Uponor retained the services of Cynthia L. Smith, an

18  engineer and one of Uponor's former employees.

19     64.     Ms. Smith issued reports and opinions in which she concluded that the

20  F1807 fittings bought from Unique Industrial and sold by Defendants were

21  defectively designed and manufactured. She concluded that the fittings were failing

22  because of stress corrosion cracking that was the result of improper manufacturing

23  practices and off-specification materials. A copy of Ms. Smith's report is attached

24  hereto as Exhibit B.

25     65.     Ms. Smith also issued reports and opinions in which she concluded that

26  the F1807 fittings sold by Defendants had not failed because of installation practices

27  or water conditions. She so concluded after analyzing fittings that had never been

28  installed – i.e. were still in their original bag -- and yet displayed manufacturing,

1    materials and other defects.

2    66.    Ms. Smith also issued reports and opinions in which she concluded that

3    the F1807 fittings sold by Defendants had failed not because of water conditions and

4    stated: "My conclusion that faulty installation was not a cause of failure in the brass

5    fittings supplied by Unique Industrial was further supported by the history of fittings

6    failures. A sudden rash of failures occurred in multiple states (where varying water

7    chemistry conditions existed) during a narrowly defined time period, involving

8    various plumbing contractors who had previous experience successfully installing

9    these components. This fact also undermines any question of installation error."

10    67.    In the course of its lawsuit against the Unique Industrial, Uponor also

11    submitted a report and opinion from engineer Thomas Eagar. Like Ms. Smith, Mr.

12    Eagar also concluded that the fittings sold by RTI and Uponor were defectively

13    manufactured. A copy of Mr. Eagar's report is attached as Exhibit C.

14    68.    Mr. Eagar concluded that the fittings had failed because of improper

15    machining practices, improper alloy composition and microstructure.

16    69.    Like Ms. Smith, Mr. Eagar also concluded that the composition of

17    many of the fittings failed to comply with the ASTM standards governing F1807

18    fittings. Fittings that do not comply with that standard cannot be passed off and sold

19    as being eligible for use in potable water systems in the United States.

20    70.    Mr. Eagar also concluded that inappropriately elevated finish hardness

21    and other residual stress from manufacture had contributed to the premature failure

22    of the fittings.

23    71.    In addition to these judicial admissions, Uponor now publicly criticizes

24    the F1807 fitting design. In a document currently available on its website, Uponor

25    compares its F1960 fittings with the F1807 style fitting both Defendants previously

26    sold.

27    72.    In that product comparison, Uponor is critical of the thinner wall

28    thickness of the F1807 fittings and states that: "Thinner wall offers less resistance to

1   stress and corrosion." A copy of that advertisement is attached as Exhibit D.

2       73.    Uponor therefore itself now publicly criticizes the design flaws in the

3   F1807 fittings and, as it did in its 2006 talking points memorandum, concedes that

4   "the quality and design of the brass insert fitting used in the [Plumb-Pex system]

5   does not measure up to Uponor's high quality standards."

6   **Replacement of F1807 Fittings and Pex Systems**

7       74.    Recognizing that the F1807 fittings they sold were defective,

8   Defendants have paid for or authorized the replumbing of certain properties

9   containing those systems.

10      75.    For example, Defendants have paid for or authorized the replumbing of

11  properties containing systems with F1807 fittings in the State of Virginia.

12      76.    In addition, Defendants have paid for or authorized the replumbing of

13  properties containing systems with F1807 fittings in the State of Nevada. In that

14  replumbing program, Defendants agreed to replumb all homes built by D.R. Horton

15  in which Defendants' F1807 fittings are installed.

16      77.    In an October 2008 letter to homeowners, RTI advised homeowners "of

17  the risk that the plumbing system in your home may be susceptible to future leaks."

18  In that same letter, RTI offered to pay for complete repiping of plumbing systems

19  owned by the purchasers of D. R. Horton homes. A copy of the RTI letter is attached

20  as Exhibit E.

21      78.    Unfortunately, Defendants refuse to repipe or replumb the homes or

22  properties of all persons or entities who own systems with Defendants' F1807

23  fittings. Defendants instead apparently offer that work to only the customers of large

24  home builders, leaving other consumers without the benefit of the same replacement.

25      79.    Defendants have refused the requests to of property owners to replumb

26  their home to replace the fittings Defendants themselves have admitted are defective,

27  unreasonably dangerous and not merchantable.

28

**Inadequate Testing of Brass Insert Fittings**

80.     Contrary to statements made in their advertising and marketing, Defendants did not test and did not ensure that the F1807 brass insert fittings had been tested in their anticipated environments before selling those fittings to the public. Defendants also failed to require their suppliers to perform such testing.

81.     Defendants did not "end use" test the brass insert fittings in pex plumbing systems and instead they or their suppliers used various assumptions when choosing or specifying the design and materials for this system. Such a practice violates engineering and manufacturing standards and accepted practice. Defendants also failed to require their suppliers to perform such testing.

82.     Defendants and/or their suppliers also conducted inadequate testing on their F1807 brass insert fittings and failed to test things that they knew or should have known would lead to premature failure of the brass fittings. Defendants also failed to require their suppliers to perform such testing.

83.     Defendants and/or their suppliers also failed to investigate or test whether well-known and expected water conditions would lead to premature failure of the brass insert fittings. Defendants also failed to require their suppliers to perform such testing.

**False Advertising of Pex Plumbing Systems**

84.     Defendants falsely advertised that their pex plumbing systems – including their F1807 brass insert fitting components -- were reliable despite never testing and determining the reliability of the product when used in real world conditions.

85.     Defendants also falsely advertised that RTI had a long history in the plumbing industry and falsely claimed that the Plumb-Pex system was proven, reliable and the result of rigorous engineering and quality control.

86.     For example, on RTI's web site, www.radiant-tech.com, Defendants advertised Radiant Technology in 1997 as company only in the business of selling

radiant heating systems. Yet the very next year in 1998, RTI began claiming on the same web site that "Radiant Technology is a North American leader in the manufacture of both plumbing and heating products." Defendants knew that this statement was false and misleading because, among other things, RTI had just started selling plumbing systems for potable water. In addition, Defendants knew that they were not in fact manufacturing plumbing systems and knew that they were not the manufacturer of the Plumb-Pex brass fittings. Defendants continued to make these false statements on the www.radiant-tech.com web site until the fall of 2002. They then continued to make the same or similar false statements on RTI's new web site, www.rti-systems.com, until the fall of 2004 when they announced that RTI would be closed.

87.    On RTI's web site, www.radiant-tech.com, Defendants falsely claimed in 1998 that "Plumb-Pex is proven, reliable and completely safe for you and your family." Defendants knew that this statement was false and misleading because, among other things, RTI apparently did not do any engineering of the Plumb-Pex system and instead simply bought the fittings from manufacturers located in Asia. Defendants now claim that they did not design or manufacture the Plumb-Pex fittings and had absolutely no idea whether this system was "reliable" as they advertised to the public. In addition, this statement falsely claims that the Plumb-Pex system, which had just been developed and had little or no track record in the field, was "proven" or "reliable." Defendants continued to make these false statements on the www.radiant-tech.com web site until at least the fall of 2002. They then continued to make the same or similar false statements on RTI's new web site, www.rti-systems.com, until the fall of 2004 when they announced that RTI would be closed.

88.    On RTI's web site, www.radiant-tech.com, Defendants falsely claimed in 1998 that "Our Plumb-Pex system is a carefully engineered flexible piping system that provides a durable, proven, and guaranteed solution to all your plumbing needs. RTI maintains the highest quality standards in the industry." Defendants knew that

1  this statement was false and misleading because, among other things, RTI apparently
2  did not do any engineering of the Plumb-Pex system and instead simply bought the
3  fittings from manufacturers located in Asia. Defendants now claim that they did not
4  design or manufacture the Plumb-Pex fittings and had absolutely no idea whether this
5  system was "carefully engineered" as they advertised to the public. In addition, this
6  statement falsely claims that the Plumb-Pex system, which had just been developed
7  and had little or no track record in the field, was "proven" or "durable." In addition,
8  RTI knew it did not have "the highest quality standards in the industry" when it did
9  no quality control on the fittings in question. Defendants continued to make these
10 false statements on the www.radianttech. com web site until at least the fall of 2002.
11 They then continued to make the same or similar false statements on RTI's new web
12 site, www.rti-systems.com, until the fall of 2004 when they announced that RTI
13 would be closed.

14     89.    On 1998 RTI's web site, www.radiant-tech.com, Defendants falsely
15 claimed that "With Radiant Technology's dedication to quality, you're assured of a
16 long lasting and trouble free plumbing system." Defendants continued to make these
17 false statements on the www.radiant-tech.com web site until at least the fall of 2002.
18 They then continued to make the same or similar false statement on RTI's new web
19 site, www.rti-systems.com, until the fall of 2004 when they announced that RTI
20 would be closed. Defendants knew that this statement was false and misleading
21 because, among other things, RTI did not do any quality control of the manufacturing
22 process of the Plumb-Pex fittings and instead simply bought the fittings from third
23 party manufacturers in Asia. Defendants therefore had no basis to represent that the
24 quality standards used for the manufacture of the Plumb-Pex fittings would assure a
25 long lasting and trouble free plumbing system. Defendants have since admitted in
26 their lawsuit against Unique Industrial that Unique Industrial did not use acceptable
27 quality standards and instead used substandard and unacceptable quality control and
28 manufacturing processes.

90.    In November 2002, Defendants published a Plumb-Pex brochure they distributed to consumers and made available on the RTI web site, www.rtisystems.com. In that brochure, Defendants falsely claimed that the Plumb-Pex system was a "carefully engineered flexible piping system which provides a durable, proven, and guaranteed solution to all your plumbing needs." Defendants continued to distribute the same or similar statements in that brochure for at least several years. Defendants knew that this statement was false and misleading because, among other things, RTI apparently did not do any engineering of the Plumb-Pex system and instead simply bought the fittings from manufacturers in Asia. Defendants have since admitted that they did not design or manufacture the fittings used in this system and have absolutely no idea whether this system was "carefully engineered" as they advertised to the public. In addition, this statement falsely claims that the Plumb-Pex system, which had only been sold for a few years, was "durable" and "proven."

91.    In November 2002, Defendants published a Plumb-Pex brochure they distributed to consumers and made available on the RTI web site, www.rtisystems.com. In that brochure, Defendants falsely claimed that "We have the highest quality standards in the industry." Defendants continued to distribute the same or similar statements in that brochure for at least several years. Defendants knew that this statement was false and misleading because, among other things, RTI did not do any quality control of the manufacturing process of the Plumb-Pex fittings and instead simply brought the fittings from third party suppliers in Asia. Defendants therefore had no basis to represent that the quality standards used for the manufacture of the Plumb-Pex fittings were "the highest quality standards in the industry." Defendants have since admitted in their lawsuit against Unique Industrial that Unique Industrial did not use the highest quality standards in the industry and instead used substandard and unacceptable quality control and manufacturing processes.

92.     In November 2002, Defendants published a Plumb-Pex brochure they distributed to consumers and made available on the RTI web site, www.rtisystems.com. In that brochure, Defendants falsely claimed that "With RTI's dedication to quality, you're assured of a long lasting and trouble free plumbing system." Defendants continued to distribute the same or similar statements in that brochure for at least several years. Defendants knew that this statement was false and misleading because, among other things, RTI did not do any quality control of the manufacturing process of the Plumb-Pex fittings and instead simply bought the fittings manufacturers in Asia. Defendants therefore had no basis to represent that the quality standards used for the manufacture of the Plumb-Pex fittings would assure a long lasting and trouble free plumbing system. Defendants have since admitted in their lawsuit against Unique Industrial that Unique Industrial did not use acceptable quality standards and instead used substandard and unacceptable quality control and manufacturing processes.

93.     Beginning no later than 2003, the "Who we are" section of the RTI web site, www.rtisystems.com falsely claimed that "Our Radiant Technology Heating and Plumb-Pex Plumbing Systems are a result of over 20 years of experience and are backed by RTI's steadfast commitment to quality, product innovation, engineering and manufacturing technology." Defendants continued to make this statement on that site for at least several years. Defendants knew that this statement was false and misleading because, among other things, the Plumb-Pex system was new and had not been in existence for 20 years. Nor did RTI have 20 years' of experience in the plumbing industry. Defendants also knew that this statement was false and misleading because RTI did not do any quality control of the manufacturing process of the Plumb-Pex fittings and instead simply bought the fittings from manufacturers in Asia. Defendants therefore had no basis to represent that the quality and engineering standards used for the manufacture of the Plumb-Pex fittings were acceptable or of high quality. Defendants have since admitted in their lawsuit against

1   Unique Industrial that Unique Industrial did not use acceptable quality standards and
2   instead used substandard and unacceptable quality control and manufacturing
3   processes.

4       94.    Beginning no later than 2003, the "Who we are" section of the RTI web
5   site, www.rtisystems.com falsely claimed that "All RTI products undergo thorough
6   testing to pass not only our strict quality standards, but to assure that we exceed
7   those set by independent quality assurance agencies both in America and abroad."
8   Defendants continued to make this statement on that site for at least several years.
9   Defendants knew that this statement was false and misleading because, among other
10  things, because RTI did not do any quality control of the manufacturing process of
11  the Plumb-Pex fittings and instead simply bought the fittings through manufacturers
12  in Asia. Defendants therefore had no basis to represent that fittings had undergone
13  thorough testing to pass RTI's "strict quality standards." Defendants knew that they
14  did nothing to test the quality of the fittings and had no idea whether any testing or
15  quality assurance was being done by the suppliers of the fittings.

16      95.    Each of the false statements and misrepresentations made in the
17  preceding paragraphs were repeatedly restated by Defendants' sales personnel,
18  including but not limited to Frank Bilotta and David Holdorf, as well as Defendants'
19  manufacturer's representatives, in the course of virtually every sale of the brass
20  fittings at issue here. All of the sales and product literature provided by Defendants
21  falsely implied that the Plumb-Pex system was proven, reliable, time tested, and the
22  result of rigorous engineering and quality control practices. Defendants, however,
23  knew at the time these statements were provided to consumers, suppliers, and
24  contractors that the statements were false and unsupported.

25      96.    At all times and in all communications with consumers, suppliers and
26  contractors, Defendants and their representatives knowingly misrepresented RTI's
27  experience in the plumbing industry. Contrary to the statements referenced herein,
28  RTI was new to the potable water plumbing industry and had no experience in the

1    design, manufacture and quality control of potable water plumbing systems and the

2    brass fittings used for those systems.

3      97. At all times and in all communications with consumers, suppliers and

4    contractors, Defendants and their representatives knowingly misled consumers into

5    believing that RTI and/or Uponor actually designed, manufactured and quality

6    controlled the Plumb-Pex system. In reality, Defendants knew that they had

7    delegated all of those tasks to foreign manufacturers without any oversight by

8    Defendants about the materials selections and manufacturing practices used to make

9    the brass insert fittings used in those systems.

10     98. The falsity of Defendants' representations set out above can be seen

11   from Defendants' judicial admissions. For example, Uponor states in its Amended

12   Complaint in its lawsuit against Unique Industrial that: "Unique Industrial selected

13   Duksan Metal Co. of Korea to design, engineer and manufacture the Fittings. Neither

14   RTI nor Uponor participated in the selection of Duksan nor did they have contact

15   with Duksan relating to the means, methods or circumstances regarding the

16   manufacture of the fittings."

17     99. The falsity of Defendants' representations set out above can be seen

18   from Defendants' judicial admissions. For example, Uponor states in its Amended

19   Complaint in its lawsuit against Unique Industrial that Unique Industrial:

20     a) defectively manufactured the subject Fittings;

21     b) failed to take reasonable steps to ensure that the Fittings
22      would not be subject or prone to fracturing post-
        manufacture in expected and intended residential use;

23              * * *

24     d) failed to properly test, inspect and evaluate the Fittings . . .
        prior to distributing those products to determine that they
25      were suitable and fit for installation in residential plumbing
        systems;

26
27     e) supplied RTI and UPONOR with . . . Fittings that were not
        merchantable, or suited for their reasonable, expected and
        intended use in residential plumbing systems, and which
28      were not free from defects in materials, design and

1    workmanship;

2                            * * *

3      g)    failed to supply Fittings that complied with ASTM
            standard F1807 and the chemical composition
4            requirements specified in the attachments thereto;

5    See Exhibit A attached hereto. These admissions about the engineering, quality

6    control, and compliance with ASTM standards starkly contrast the false statements

7    made by Defendants to sell the Plumb-Pex systems.

8        100.   At all times and in all communications with consumers, suppliers and

9    contractors, Defendants and their representatives knowingly misled consumers into

10    believing that the Plumb-Pex system was designed, manufactured and quality

11    controlled in the United States. In reality, Defendants knew that they had sourced all

12    of those tasks to foreign manufacturers without any oversight by Defendants about

13    the materials selections and manufacturing practices used to make the brass insert

14    fittings used in those systems.

15        101.   At all times and in all communications with consumers, suppliers and

16    contractors, Defendants and their representatives knowingly misled consumers into

17    believing that the Plumb-Pex system was designed, manufactured and quality

18    controlled in the United States by virtue of Defendants' placement of a stamp on

19    those fittings that read "US-PW." Defendants knew and intended that such a stamp

20    would mislead U.S. consumers into believing that the fittings were manufactured in

21    the United States for use in potable water ("PW") systems. Defendants did this to

22    conceal the fact that they did not in fact manufacture the fittings and that they had

23    instead purchased the fittings cheaply from Asia and instructed that the

24    manufacturers in Korea and Taiwan affix these stamps to the fittings.

25        102.   Plaintiffs and their representatives believed, based on Defendants'

26    representations, that Defendants designed, manufactured and quality controlled the

27    Plumb-Pex fittings. Plaintiffs and their representatives would not have purchased or

28    used Plumb-Pex fittings if they had known the truth about who designed,

1   manufactured and quality controlled the fittings.

2       103.   When Defendants and their representatives made each of the affirmative

3   misrepresentations outlined above, Defendants knew the representations were false

4   and/or misleading. Defendants and their representatives intended that consumers and

5   purchasers of the Plumb-Pex system would rely on the false and misleading

6   statements. The plumber that installed the plumbing system at Plaintiffs' home in fact

7   received and relied on such representations in its decision to purchase and install

8   Defendants' Plumb-Pex plumbing systems.

9       104.   Defendants also falsely stated in their advertising brochures and web

10  site listings that the brass insert fittings used in the Plumb-Pex systems complied

11  with ASTM F1807. For example, the April 2003 Plumb-Pex Plumbing Systems

12  Design and Installation brochure states that "Plumb-Pex fittings are manufactured of

13  solid brass to ASTM F-1807 'Metal Insert Fittings' specifications. Other literature

14  produced by Defendants makes similar representations and similar representations

15  were repeatedly made throughout the years on Defendants' www.radianttech. com

16  and www.rti-systems.com web sites.

17      105.   In addition to the representations made in their advertising materials and

18  on their web sites, every one of the brass insert fittings sold by Defendants had a

19  stamp on the side of the fitting which indicated that the fittings conformed to ASTM

20  F877 and ASTM F1807. When a product or packaging is marked with the ASTM

21  designation F1807, the product is represented to have been manufactured, tested,

22  inspected and sampled in accordance with F1807 and has been found to meet F1807

23  requirements.

24      106.   Defendants' fittings, however, did not comply with various aspects of

25  the F1807 requirements including alloy composition and dimensions. Defendants

26  knew or should have known that their advertising statements about compliance with

27  ASTM standards were false. Defendants knew or should have known that their

28  certification of compliance with ASTM standards by stamping those designations on

1  the fittings were false.

2      107.   At all times and in all communications with consumers, suppliers and

3  contractors, Defendants and their representatives knowingly misled consumers into

4  believing that the brass insert fittings in their Plumb-Pex system complied with

5  ASTM standards. Plaintiffs, their representatives and other consumers relied on

6  these misrepresentations because the Plumb-Pex fittings could not have been used in

7  potable water systems in the United States without compliance with those standards.

8  Defendants, therefore, passed off brass fittings as being of a particular quality,

9  standard or grade that they were in fact not.

10      108.   Contrary to their representations about the fittings having been

11  manufactured, tested, inspected and sampled in accordance with F1807, Uponor's

12  experts Ms. Smith and Mr. Eagar have concluded that the Plumb-Pex fittings failed

13  to meet F1807 requirements.

14      109.   Defendants also falsely represented that owners of their pex plumbing

15  systems "can rest assured that your new plumbing . . . system will provide a lifetime

16  of reliable service."

17      110.   Defendants also falsely advertised and represented that their pex

18  plumbing systems and their F1807 brass insert fittings had been subject to decades of

19  "rigorous testing . . . and testing and testing and testing."

20      111.   Defendants also falsely marketed their pex plumbing systems as being

21  safe, reliable, and corrosion-resistant.

22      112.   Defendants also falsely marketed and warranted their pex plumbing

23  systems as being extensively tested, and that based on the results of those tests, the

24  pex plumbing system and their F1807 brass insert fittings were properly designed,

25  developed, marketed, and manufactured so as to perform adequately, reliably and as

26  represented.

27      113.   Defendants also falsely marketed and warranted that their pex plumbing

28  systems were superior to copper plumbing systems.

- 21 -
COMPLAINT IN CLASS ACTION

114.   Defendants also falsely marketed and warranted that their pex plumbing systems and the F1807 brass insert fittings were of superior design and materials than similar products made by competitors.

115.   When Defendants and their representatives made each of the affirmative misrepresentations outlined above, Defendants knew the representations were false and/or misleading. Defendants and their representatives intended that consumers and purchasers of the Plumb-Pex system would rely on the false and misleading statements.

116.   Defendants and their authorized agents and distributors made each of the above described assertions, statements, representations and warranties with the intent and purpose of inducing plumbing suppliers, builders, plumbers, and consumers to purchase and install pex plumbing systems and their F1807 brass insert fittings in their properties throughout the country.

**Defendants' Omissions About the Quality of Their Plumb-Pex Fittings**

117.   Defendants also made numerous material omissions and uniformly withheld important information relating to the design, reliability and performance of their brass insert fittings and pex plumbing systems.

118.   Among these omissions were the failure to inform purchasers and consumers about the tendency for these fittings to fail because of stress corrosion cracking or dezincification and to inform them that Defendants and their suppliers had done little or no testing to determine whether these fittings and the systems in which they were used would perform well in real world conditions.

119.   Defendants also omitted material information about the limitations of the high zinc content yellow brass fittings including, for example, that the published literature going back as far as the 1940's had shown the propensity of that type of brass to crack in even pure water.

120.   Defendants also omitted material information about the limitations of the high zinc content yellow brass fittings including, for example, that the propensity

1    of that type of brass to crack exponentially increases following rough machining or

2    finish practices like those used by Defendants and/or their suppliers.

3        121.   Defendants also omitted material information from consumers about

4    their lack of quality control or input about the design and manufacturing practices

5    used to make the Plumb- Pex fittings.

6        122.   Defendants also omitted material information from consumers including

7    the fact that Defendants had completely delegated the design, manufacture and

8    quality control of the Plumb-Pex fittings to others, including foreign manufacturers

9    located in Asia or elsewhere.

10        123.   Defendants also omitted material information about their belief that "the

11    quality and design of the brass insert fitting used in the [Plumb-Pex system] does not

12    measure up to Uponor's high quality standards."

13        124.   Defendants also omitted material information from consumers about the

14    country of origin and origin of the design and manufacture of the Plumb-Pex fittings.

15        125.   Defendants also omitted material information from consumers about the

16    availability of materials that were more resistant to stress corrosion cracking than the

17    high zinc content yellow brass used to make the Plumb-Pex fittings.

18        126.   Defendants also omitted material information from consumers about

19    RTI's lack of experience in the plumbing industry and the fact that it had never

20    manufactured or sold pex plumbing products before it began selling the Plumb-Pex

21    system.

22        127.   Each of the omissions made in the preceding paragraphs were

23    repeatedly made by Defendants' sales personnel, including but not limited to Frank

24    Bilotta and David Holdorf, as well as Defendants' manufacturer's representatives, in

25    the course of virtually every sale of the brass fittings at issue here. All of the sales

26    and product literature provided by Defendants, Defendants' web sites, and their sales

27    presentations all omitted the material facts recited herein. Defendants never

28    disclosed the true facts they omitted as described above.

128.   Had Defendants not withheld and omitted this material information about the design, reliability and performance of their F1807 brass insert fittings and pex plumbing systems, Plaintiffs, their representatives and the members of the putative class would not have purchased those products, allowed them to be installed in their homes or properties, or purchased homes and properties with such systems.

**Field Failures of Defendants' Pex Plumbing systems**

129.   By 2006 at the latest, Defendants received notice that their brass insert fittings were failing prematurely.

130.   Defendants' brass insert fittings have failed prematurely in numerous locations throughout the United States, including Arizona, Florida, Minnesota, Virginia, Washington, Wisconsin, Oregon, Utah, Montana, Missouri, Vermont, Iowa, Michigan, Louisiana, Idaho, California and Indiana.

131.   Defendants analyzed the cause of these failures and concluded that the fittings were failing because of stress corrosion cracking and/or dezincification.

132.   To-date, Defendants have received hundreds of warranty claims for the failed F1807 style fittings.

133.   Because of these failures, Defendants have completely stopped selling F1807 style fittings.

134.   In recognition of the problems with its choice of high zinc content brass, Uponor now offers different materials for use in its pex plumbing fittings.

**Plaintiffs' Circumstances**

135.   Plaintiffs own a home that has a pex plumbing system sold through Defendants' authorized distributors. That pex plumbing system used the brass fittings marketed and sold by Defendants and described herein.

136.   The fittings in Plaintiffs' home are stamped with both "MB pex" and "P pex" designations. The plumbing system uses Uponor pex piping throughout the home.

137.   In mid-January 2010, one of the F1807 fittings sold by Defendants

- 24 -

1  catastrophically failed at Plaintiffs' home, causing damage to property other than the

2  pex plumbing system. The failure caused extensive damage to Plaintiffs' home and

3  property.

4      138.  Numerous other homes in Plaintiffs' neighborhood have had F1807

5  fittings leak and cause property damage.

6      139.  Because of problems with the brass fittings in their home and in their

7  neighborhood, Plaintiffs asked Uponor to replace all Uponor / RTI fittings that

8  remained in their home. Uponor has not responded to that request, leaving Plaintiffs

9  with brass fittings in their home that Defendants have conceded are defective,

10  unreasonably dangerous and not merchantable and which are destined to fail in the

11  future.

12      140.  Plaintiffs, like many class members, have already suffered out-of-pocket

13  damage to repair their home or the properties of others following the premature

14  failures of Defendants' brass insert fittings. Likewise, all putative class members

15  have incurred or are reasonably certain to incur, the cost of repairing their homes

16  because of fittings failures and/or prematurely replacing their plumbing systems.

17      141.  Plaintiffs and the proposed class members suffered general and specific

18  compensatory and contractual damages including, without limitation consequential,

19  incidental, loss of use, diminution of value, attorneys' fees, costs and disbursements.

20  **DEFINITION OF PROPOSED CLASSES**

21      142.  Plaintiffs bring this class action on behalf of themselves and all others

22  similarly situated, for all claims alleged herein, pursuant to Rule 23 of the Federal

23  Rules of Civil Procedure. The first proposed class is defined as:

24      All persons and entities that own a structure that contains a pex
        plumbing system with F1807 brass insert fittings sold by Uponor or
25      RTI. The proposed class includes, without limitation, all such persons
        or entities who contacted Defendants or their representatives about their
26      pex plumbing system and were denied or partially denied warranty
        coverage and /or replacement of their pex plumbing system.

27

28

143.   Alternatively, Plaintiffs bring this class action on behalf of themselves and all others similarly situated, for all claims alleged herein, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for a second proposed class defined as:

> All persons and entities that own a structure, within certain of the United States, which contains a pex plumbing system with F1807 brass insert fittings sold by Uponor or RTI. The proposed class includes, without limitation, all such persons or entities who contacted Defendants or their representatives about their pex plumbing system and were denied or partially denied warranty coverage and /or replacement of their pex plumbing system.

144.   Plaintiffs specifically exclude Defendants or their related entities from the putative class, all subsidiaries or affiliates of Uponor; any entity in which Defendants have a controlling interest; and any and all of Defendants' employees, affiliates, legal representatives, heirs, successors or assignees.

145.   Plaintiffs also specifically exclude from the putative class any person or entity that has previously commenced and concluded a lawsuit against Defendants arising out of the subject matter of this lawsuit.

146.   Plaintiffs also specifically exclude from the putative class the judge assigned to this case and any member of the judge's immediate family.

147.   Plaintiffs specifically include in the putative class the claims of all persons or entities, like insurance companies, that have paid for the repair, replacement and/or damage caused by prematurely failed brass insert fittings sold by Defendants.

### SATISFACTION OF CLASS PREREQUISITES

148.   This class action satisfies numerosity, commonality, typicality, adequacy and superiority requirements for maintaining a class.

149.   **Numerosity.** Pursuant to Rule 23(a)(1) of the Federal Rules of Civil Procedure, the putative class "is so numerous that joinder of all members is impracticable." The number of members of the putative class is believed to be tens of thousands of individuals and/or entities that own properties with Defendants' pex plumbing systems with F1807 brass insert fittings.

150.   Joinder of the persons and entities into whose properties the Defendants' pex plumbing systems were installed is impractical and not feasible.

151.   **Commonality.** Pursuant to Rule 23(a)(2) of the Federal Rules of Civil Procedure, the putative class shares "questions of law or fact" that predominate and individualized issues. The common questions include, but are not limited to, the following:

- Were Defendants' brass insert fittings defectively designed for their intended application?

- If so, what is the nature of the design defect?

- Were Defendants' brass insert fittings defectively manufactured?

- Did Defendants fail to warn consumers that the brass insert fittings were not properly tested during design and development process?

- Did Defendants adequately warn consumers about any types of installations that may cause premature failure of the brass insert fittings?

- Did Defendants make fraudulent, false, deceptive and/or misleading statements in connection with the sale of pex plumbing systems in their product literature, including those relating to standards and reliability?

- Did Defendants omit material information when they sold their pex plumbing systems and F1807 brass insert fittings?

- Did Defendants properly account for foreseeable variations in installation in the development and design of their pex plumbing system and brass insert fittings?

- Did Defendants exercise reasonable care in the design, manufacture and testing of their pex plumbing system and F1807 brass insert fittings?

- Are the brass insert fittings progressively deteriorating at an accelerated rate?

- Will the brass insert fittings fail prematurely?

- Did Defendants deliberately sell or allow brass insert fittings to be distributed after they knew the fittings were failing at an increased rate?

- What categories of damages are recoverable for owners of structures with Defendants' pex plumbing systems and brass insert fittings, e.g., replacement, consequential, incidental or other damages?

- Are Plaintiffs entitled to relief under Defendants' express warranty?

- Can the class obtain a declaration concerning the types and categories of damages and remedies available to putative class members?

COMPLAINT IN CLASS ACTION

- Should Defendants be enjoined from denying warranty claims based on alleged warranty disclaimers or limitations?
- Are Plaintiffs' claims barred in whole or in part by any of Defendants' affirmative defenses?

152.   **Typicality.** Pursuant to Rule 23(a)(3) of the Federal Rules of Civil Procedure, the claims of the putative class representatives, Plaintiffs, "are typical of the claims … of the class." Plaintiffs and all members of the putative class who own Defendants' defective pex plumbing systems with F1807 brass insert fittings have suffered damages as a result of Defendants' wrongful acts and misconduct. Pursuant to corporate directives, Defendants engaged in a similar pattern of misconduct towards both the Plaintiffs and all the other putative class members.

153.   **Adequacy.** Pursuant to Rule 23(a)(4) of the Federal Rules of Civil Procedure, the putative class representatives "will fairly and adequately protect the interests of the class." Plaintiffs have no adverse interests to the putative class members. Plaintiffs were sold or installed plumbing systems with defective brass insert fittings. Plaintiffs have retained lawyers who have substantial resources, experience and success in the prosecution and defense of class action, mass tort and complex litigation, and the insurance coverage and settlement issues attendant to the same.

154.   **Superiority.** Pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, a class action is a superior method of resolving this action for the following reasons: A class action in this instance conserves the resources of the putative class, Defendants and the Court. The damages of most putative class members are not, in isolation, significant enough to hire an attorney on a contingency basis, and the burden and expense of hiring an attorney on a per diem basis for Plaintiffs and most putative class members, makes it difficult if not impossible for the class members to seek redress. On information and belief, no Attorney General of any state has brought an enforcement action against Defendants to remedy the claims

1 asserted herein. Because the nature of the claims involved, the class members need

2 swift and uniform resolution of their claims before additional damage is caused by

3 plumbing system failures. Defendants have refused to pay Plaintiffs and the putative

4 class members their full damages. Further, there may or will be other cases pending

5 against Defendants. Serial adjudications in numerous venues are not efficient, timely,

6 or proper. Judicial resources throughout the United States will be unnecessarily

7 depleted by resolution of individual claims. Joinder on an individual basis of

8 thousands of claimants in any one suit would be impractical or impossible.

9 Individualized judgments and rulings could result in inconsistent relief for similarly

10 situated plaintiffs. Individualized lawsuits could also establish incompatible

11 standards of conduct for Defendants in creating, marketing, sale and post-sale

12 conduct in connection with their pex plumbing systems and brass insert fittings.

13                                            **COUNT I**

14                                        **(NEGLIGENCE)**

15       155.   Plaintiffs and the putative class members reallege the foregoing

16 paragraphs, inclusive, as though fully set forth herein.

17       156.   Defendants were negligent in that they failed to use reasonable care

18 when they created, marketed and sold their pex plumbing systems with F1807 brass

19 insert fittings.

20       157.   As the manufacturer and/or seller of consumer products, Defendants

21 owed a duty to Plaintiffs and the putative class members to provide a safe and

22 quality product, and a duty to provide a product that would perform as it was

23 advertised. Defendants breached those duties.

24       158.   That as a direct and proximate result of Defendants' negligence, lack of

25 care, and other wrongful acts, Plaintiffs and the putative class members sustained

26 and will sustain damages.

27       159.   As a result of Defendants' negligence, Plaintiffs and the putative class

28 have suffered actual damages in that they have purchased and installed in their

1 homes and structures, or the homes and structures of their customers, a plumbing

2 system that is defective and is damaged upon its initial use.

3     160. As a result of Defendants' negligence, Plaintiffs and the putative class

4 will suffer damages that include not only the full cost to replace brass insert fittings

5 and plumbing systems, but also include, without limitation, consequential and

6 incidental damages.

7     161. That as a direct, proximate and foreseeable result of Defendants'

8 negligence, Plaintiffs and the putative class members have been damaged, in the

9 aggregate, in an amount to be determined at trial.

10 **COUNT II**

11 **(NEGLIGENT FAILURE TO WARN)**

12     162. Plaintiffs and the putative class members re-allege the foregoing

13 paragraphs, inclusive, as though fully set forth herein.

14     163. As the manufacturer and seller of a consumer product, Defendants had

15 a duty to provide instructions for proper use of their products.

16     164. As the manufacturer and seller of a consumer product, Defendants had

17 a duty to warn of foreseeable dangers inherent in the proper use of their products and

18 also had a duty to warn of dangers associated with foreseeable misuse of their

19 products.

20     165. Defendants became aware through various claims and reports that the

21 brass insert fittings they were selling, distributing and advertising were subject to

22 premature failures, problems and deterioration.

23     166. Despite the fact that Defendants knew their product was defective and

24 that their pex systems would not perform as advertised, warranted or otherwise

25 expressly represented, Defendants continued to sell the products to the public

26 without correction and, in fact, concealed from the public the fact that their pex

27 system and brass insert fittings were defective, not durable and would begin to fail

28 immediately upon being placed into service.

167.  Because the pex plumbing systems related to the habitability of persons' homes, Defendants had a duty to the consumer and to the public to disclose the defective nature of their system and not to conceal and suppress the defective nature of the product from Plaintiffs and the putative class members.

168.  Defendants, however, have engaged in a scheme to cover up the true nature of the problem with their brass insert fittings and plumbing systems. This scheme included the concealment of Defendants' marking as "confidential" their 2006 talking points memorandum which concedes that "the quality and design of the brass insert fitting used in the [Plumb-Pex system] does not measure up to Uponor's high quality standards." This scheme also includes Uponor's attempts to keep information about its admissions of the defective nature of the fittings out of the public domain by trying to seal court files and by engaging in replumbing programs for some large home builders utilizing secured web sites and other methods of communication to preclude others from learning about the problems with the Plumb-Pex systems.

169.  To this day, Defendants continue in this pattern of concealment and suppression by deliberately and knowingly misrepresenting to the public the true nature of the problems with the brass insert fittings. In fact, many members of the putative class are still unaware that their plumbing system is prematurely failing and will continue to fail due to its design and manufacturing defects.

170.  That to the extent Defendants claim in this lawsuit -- contrary to their prior judicial admission -- that the premature failures of their plumbing systems and brass insert fittings was the result of characteristics of the water chemistry present in Plaintiffs or the members of the putative class's water supply, Defendants failed to warn of those characteristics or dangers. As the manufacturer, seller and distributor of consumer products, Defendants had a duty to provide such information.

171.  That to the extent Defendants claim in this lawsuit – contrary to their prior judicial admissions -- that the premature failures of their plumbing systems and

1  brass insert fittings was the result of characteristics of the water chemistry present in

2  Plaintiffs or the members of the putative class's water supply, Defendants failed to

3  provide Plaintiffs and members of the putative class with any instructions,

4  information or warnings about the types of water conditions likely to cause

5  premature failures. As the manufacturer and seller of consumer products, Defendants

6  had a duty to provide such information.

7      172.   That as a direct, proximate and foreseeable result of Defendants' failure

8  to warn, Plaintiffs and the proposed members of the class suffered damage.

9      173.   As a result of Defendants' failure to warn, Plaintiffs and the putative

10  class have suffered actual damages in that they have purchased and installed in

11  homes and structures a plumbing system that is defective and that has caused

12  damage to property other than the system itself and that is damaged upon its initial

13  use.

14      174.   As a result of Defendants' failure to warn, Plaintiffs and the putative

15  class will suffer damages that include not only the full cost to replace their plumbing

16  systems and brass insert fittings, but also include, without limitation, consequential

17  and incidental damages.

18      175.   That as a direct, proximate and foreseeable result of Defendants'

19  negligence, Plaintiffs and the putative class members have been damaged, in the

20  aggregate, in an amount to be determined at trial.

21                    **COUNT III**

22              **(BREACH OF EXPRESS WARRANTIES)**

23      176.   Plaintiffs and the putative class members re-allege the foregoing

24  paragraphs, inclusive, as though fully set forth herein.

25      177.   Defendants made certain express warranties to distributors, plumbers

26  and consumers about the goods they would provide.

27      178.   The express warranties provided by Defendants included warranties

28  that Defendants would provide properly designed and manufactured plumbing

1   systems and a lengthy warranty on such systems. Defendants also made numerous

2   other express warranties as previously set forth in this Complaint.

3       179.   Plumbing distributors, plumbers, Plaintiffs and the putative class

4   members relied upon Defendants' express warranties.

5       180.   Defendants breached such express warranties by providing defective

6   plumbing systems that have or are reasonably certain to fail well before the

7   warranted or useful life of the system. Defendants also breached their warranties to

8   Plaintiffs and the putative class by refusing to honor their express warranties when

9   presented with claims and damage covered by the terms of the warranty.

10      181.   Defendants also breached such express warranties by refusing to

11  replumb Plaintiffs' home and the properties of other members of the putative class.

12      182.   That as a direct, proximate and foreseeable cause of Defendants' breach

13  of express warranty, Plaintiffs and the putative class members sustained damages, in

14  the aggregate, in an amount to be determined at trial.

15                                **COUNT IV**

16                    **(BREACH OF IMPLIED WARRANTIES)**

17      183.   Plaintiffs and the putative class members reallege the foregoing

18  paragraphs, inclusive, as though fully set forth herein.

19      184.   At the time Defendants sold their pex systems, Defendants impliedly

20  warranted that: (1) those systems were fit for use as a potable water plumbing

21  system; (2) that the pex systems and their components were superior to traditional

22  copper plumbing systems; and (3) that the pex systems would pass without objection

23  in the industry.

24      185.   The foregoing warranties were intended and made for the benefit of

25  Plaintiffs, members of the Class and the future owner of any of Defendants' pex

26  systems.

27      186.   Defendants have breached these implied warranties by selling pex

28  systems that were not fit for use in potable water systems, were not superior to

copper plumbing systems, and were designed and manufactured in a way and using materials that were not acceptable to the plumbing and home construction industry.

187.   That as a direct, proximate and foreseeable cause of Defendants' breach of express warranty, Plaintiffs and the putative class members sustained damages, in the aggregate, in an amount to be determined at trial.

## COUNT V

## (DECLARATORY AND INJUNCTIVE RELIEF)

188.   Plaintiffs and the putative class members reallege the foregoing paragraphs, inclusive, as though fully set forth herein.

189.   Pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure and any applicable statute or rule providing for declaratory and/or injunctive relief, Plaintiffs and the putative class members seek a declaratory judgment as follows:

a.   To the extent Defendants allege that any pretend limitations, restrictions or disclaimers of express warranty preclude full recovery of damages, the warranties fail of their essential purpose because the remaining remedies provided therein are inadequate and deprive the class of the benefit of the bargain of their purchases, because Defendants at the time of sale and thereafter concealed and suppressed that the systems were defective, and because the provisions are otherwise unconscionable;

b.   To the extent Defendants allege that any pretend limitations, restrictions or disclaimers of express warranty preclude full recovery of damages, the same is unconscionable because the warranties do not provide adequate remedies because the defect in the plumbing systems is latent and because the Plaintiffs lack sufficient bargaining power;

c.   To the extent Defendants allege that any pretend limitations, restrictions or disclaimers of implied warranty preclude full recovery of damages, the same is unlawful and unenforceable;

d.   To the extent Defendants allege that any pretend limitations, restrictions or disclaimers of implied warranty preclude full recovery of damages, the same is barred by Defendants' failure to provide the alleged warranty disclaimers at the time of sale of the product;

e.   Any releases obtained by Defendants, that did not otherwise provide full compensation to the putative class, were fraudulently induced, are unconscionable, were obtained by suppression and concealment, were obtained under duress by persons needing to repair their plumbing systems, and are null and void; and

f.   To the extent Defendants have had an adverse adjudication against them arising from the subject matter of this Complaint, that the putative class may use offensive collateral estoppel against Defendants for the rulings and determinations therein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for relief against Defendants as follows:

1.   Certification of this matter as a class action and appointing Plaintiffs and their counsel to represent the class;

2.   Compensation for damages suffered by Plaintiffs and the putative class members;

3.   Award of reasonable attorneys' fees and costs and disbursements incurred herein;

4.   Enjoin Defendants from denying warranty claims for failed brass insert fittings;

5.   Declaring the rights and obligations of the parties as prayed for; and

6.   Such other and further relief the Court deems just and equitable.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a jury trial for all individual and Class claims so triable.

DATED: January 13, 2011          GREENBERG & RUDMAN LLP


By: _David H. Greenberg_
   David H. Greenberg
   Attorneys for Plaintiffs, Carl Fielstra III
   and Krystal Fielstra, on behalf of
   themselves and all others similarly
   situated

- 35 -

1

## ADDITIONAL COUNSEL FOR PLAINTIFFS

2

Shawn M. Raiter
**LARSON · KING, LLP**
2800 Wells Fargo Place
30 East 7th Street
St. Paul, MN 55101
Telephone: (651)312-6500
Email: sraiter@larsonking.com

Robert K. Shelquist
**LOCKRIDGE GRINDAL
NAUEN P.L.L.P.**
100 Washington Avenue South,
Suite 2200
Minneapolis, MN 55401-2197
Telephone: (612) 339-6900
Email: rshelquist@locklaw.com

Michael A. McShane
**AUDET & PARTNERS, LLP**
221 Main Street, Suite 1460
San Francisco, CA 94105-1906
Telephone: (415) 568-2555
Email: MMcShane@audetlaw.com

Charles J. LaDuca
**CUNEO GILBERT &
LADUCA, LLP**
507 C Street, N.E.
Washington, DC 20002
Telephone: (202) 789-3960
Email: CharlesL@cuneolaw.com

David L. Black
**PERKINS COIE LLP**
1899 Wynkoop Street, Suite 700
Denver, CO 80202-1043
Telephone: (303) 291-2309
Email: Dblack@perkinscoie.com

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT IN CLASS ACTION