**GREENBERG & RUDMAN LLP**
DAVID H. GREENBERG - State Bar No. 37950
6100 Wilshire Boulevard, Suite 1170
Los Angeles, California 90048
Telephone No.:    (323) 782-0500
Fax No.:          (323) 782-0543

(Additional Counsel Listed Below)

*Attorneys for Plaintiffs, Carl Fielstra III and
Krystal Fielstra, on behalf of themselves and
all others similarly situated*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Carl Fielstra III and Krystal Fielstra on behalf of themselves and all others similarly situated, | Case No.: 2:11-cv000575 PA/JCG__ |
| Plaintiffs, | **FIRST AMENDED COMPLAINT IN CLASS ACTION** |
| vs. | **DEMAND FOR JURY TRIAL** |
| Uponor, Inc., successor to Uponor North America, Inc., and Radiant Technology, Inc., | |
| Defendants. | |

Plaintiffs Carl and Krystal Fielstra, on behalf of themselves and all others

similarly situated, by and through their undersigned counsel, bring this First

Amended Complaint in class action and state and allege as follows:

## <u>THE PLAINTIFFS</u>

1.     Plaintiffs and putative class representatives Carl and Krystal Fielstra

("Plaintiffs") are husband and wife and are the owners of property in Temecula,

California.

2.     Plaintiffs bring this case on behalf of themselves and a class of

similarly situated persons and entities located in the State of California.

**THE DEFENDANTS**

3.     Defendant Uponor, Inc. is a publicly-held entity that is in the business, among other things, of advertising, warranting, manufacturing, and selling plumbing components.

4.     Uponor, Inc. is the successor to Uponor North America, Inc. and is a Minnesota corporation that maintains its principal place of business in Minnesota.

5.     Defendant Radiant Technology, Inc. ("RTI") is a foreign entity that is or was in the business, among other things, of advertising, warranting, manufacturing, and selling plumbing components.

6.     RTI is or was a wholly owned subsidiary or Uponor. RTI is believed to currently maintain its principle place of business in Minnesota.

7.     Uponor and RTI are responsible for some or all of the acts and omissions alleged herein.

8.     Uponor and RTI have acted in concert with each other with the respect to the actions and omissions alleged herein.

9.     Uponor and RTI are jointly and/or severally liable to Plaintiffs and the putative class members as joint venturers, or in the alternative, operate such that any pretend corporate formalities amongst and between the two should be disregarded or pierced, or in the alternative, are subject to an agency relationship, or in the alternative, are subject to predecessor and successor liability theories, or in the alternative, are otherwise jointly and severally liable for all acts and omissions alleged herein.

**JURISDICTION AND VENUE**

10.     This Court has jurisdiction over the parties, the putative class, and the causes of action asserted herein pursuant to Rule 23 of the Federal Rules of Civil Procedure and under the Class Action Fairness Act as the amount in controversy exceeds $5 million.

FIRST AMENDED COMPLAINT IN CLASS ACTION

11. Venue in this forum is proper in that Plaintiffs and the subject property are located in California in this district, some of the putative class members reside in California, the causes of action for the class representatives arose, in part, in California, the causes of action for putative class members arose, in part, in California, and Uponor and RTI transact business within California.

## SUMMARY OF CLASS ACTION

12. Plaintiffs, on behalf of themselves and all other persons and entities similarly situated in the State of California, bring this action for and on behalf of the owners of homes and buildings with Uponor and/or RTI plumbing systems with cross-linked polyethylene ("Pex") tubing as well as any person or entity who has paid for the repairs of or damage caused by such systems. These systems are defective.

13. Plaintiffs and the putative class members have been damaged as a result of the design, development, advertisement, marketing, sale, and warranty misconduct of Uponor and RTI in connection with Uponor and RTI pex plumbing systems that utilize brass insert fittings.

14. Uponor and RTI have sold brass insert fittings for pex plumbing systems throughout the United States.

15. Uponor and RTI warranted and advertised that their pex plumbing systems with brass insert fittings had a lengthy warranty that expressly covered consequential damages arising from leaks or failures in the plumbing systems.

16. Uponor and RTI have warranted and advertised their brass insert fittings as being "proven," "carefully engineered," "reliable" and resistant to corrosion.

17. These representations, however, proved untrue and Uponor and RTI's brass insert fittings began to prematurely fail across the country. These failures resulted in substantial damage to property other than the plumbing system.

18.    After selling these brass insert fittings across the country, Uponor now admits that the fittings are "defective," "unreasonably dangerous," and not merchantable. Uponor and RTI, however, refuse to replace the plumbing systems of all persons and entities who own properties containing the admittedly defective fittings.

19.    The failures of the Uponor and RTI brass insert fittings have and will in the future cause water leaks. These leaks have and will in turn cause extensive damage to other property including the homes and personal property of the owners.

20.    Plaintiffs and the putative class members seek damages arising from and proximately caused by Uponor and RTI's negligence, breach of contract, and breach of warranties. Plaintiffs and the putative class members also seek declaratory and injunctive relief, as described below.

## FACTUAL BACKGROUND

**Uponor and RTI Pex Plumbing Background**

21.    Uponor and RTI sell various plumbing products including pex plumbing systems and their components.

22.    Pex is an acronym for cross-linked polyethylene. Polyethylene is the raw material and the "X" in the generic name "Pex" refers to the cross-linking of the polyethylene across its molecular chains.

23.    For decades, plumbers and homeowners used copper piping for potable water plumbing systems.

24.    Copper is and has been accepted by virtually all plumbing codes throughout the United States.

25.    In the 1980's, manufacturers in the United States began selling and plumbers began installing potable water plumbing systems with tubing made from polybutylene plastic.

26.    Plumbing systems using tubing made from polybutylene plastic were

FIRST AMENDED COMPLAINT IN CLASS ACTION

touted by manufacturers as being easier to install, cheaper and longer-lasting than copper plumbing systems.

27.     Polybutylene plumbing systems quickly proved to be poorly conceived, designed and manufactured systems. Those polybutylene systems began to fail prematurely in the field causing substantial property damage.

28.     A substantial amount of litigation ensued as a result of the widespread, premature failure of polybutylene plumbing systems. Several class actions were filed and settlements in those cases exceeded $1.5 billion.

29.     At least in part in response to the failure of polybutylene plumbing systems, virtually all manufacturers ceased manufacturing polybutylene plumbing systems for sale in the United States. In addition, most plumbing codes eventually prohibited the installation of polybutylene plumbing systems.

30.     Following the demise of polybutylene systems, Uponor, RTI and other companies began selling alternative, non-copper plumbing products in the United States.

31.     Specifically, Uponor and RTI marketed and sold plumbing systems using pex tubing for use in residential and commercial settings.

32.     Uponor and RTI touted their pex plumbing systems as being easier to install, cheaper and longer-lasting than copper plumbing systems.

**Uponor and RTI Pex Brass Insert Fittings**

33.     In approximately 1997, Uponor and/or its parent company purchased RTI. In doing so, Uponor purchased RTI's assets and liabilities, its entire product line and the rights to RTI's intellectual property.

34.     Although RTI was previously involved only in the sale of radiant heating systems, after RTI was acquired by Uponor it began selling a pex plumbing system utilizing brass insert fittings that purportedly conformed to ASTM standard F1807.

35.   F1807 insert fitting systems typically use a crimp or stainless steel clamp connection design in which insert fittings made of brass alloy are inserted into the pex tubing. The brass fittings are secured by using a special tool that crimps copper rings or stainless steel clamps around the outside of the tubing, which in turn, creates a seal between the pex tubing and the brass fittings.

36.   The crimp and stainless steel clamp system design used by Uponor and RTI for their pex plumbing systems places a great deal of stress on the brass insert fittings when the system is assembled as intended.

37.   The design, choice of material and manufacturing methods of the F1807 brass insert fittings also result in residual stress within the fittings following the manufacturing process but before the system is assembled in the field.

38.   For some period of time, RTI sold the plumbing components and systems using the F1807 brass insert fittings under its own name or label. However, employees of Uponor, RTI's parent company, also promoted, marketed and sold RTI systems to, for example, the manufactured structures market. These fittings and systems were sold at least in part under the trade name "Plumb-Pex" and the brass fittings sold by Uponor and RTI were identified with "P pex" or "MB pex" stamps.

39.   On October 27, 2004, Uponor issued a press release that stated that it would close the RTI operations in early 2005. In that press release, Uponor's executive vice president, Jim Bjork, promised that Uponor "will honor existing RTI and Plasco warranties."

40.   By December 2004, Uponor began receiving RTI's inventory, including brass fittings, and began handling the ongoing purchase and distribution of RTI's Plumb-Pex system.

41.   Upon information and belief, Uponor closed the RTI operations in early 2005 and thereafter continued to sell the F1807 Plumb-Pex fittings and system.

42.   Defendants' F1807 fittings are easily identified by a "P-Pex" stamp

1  placed on the brass insert fittings and stainless steel clamps ("SSC"). As
2  Defendants' representatives have admitted at deposition, Defendants' also sold
3  fittings stamped with "MB pex" for use in their F1807 systems.

4      43.    Defendants were negligent in selling these fittings for a number of
5  reasons, including their decision to actively market, promote and sell fittings made
6  from brasses with high zinc content, known as "yellow brass."

7      44.    Defendants knew or should have known that the brass alloy used for
8  the brass insert fittings they sold and marketed made the fittings susceptible to
9  premature failure through various processes like dezincification and stress corrosion
10 cracking.

11     45.    Defendants knew or should have known that the fitting design, pex
12 system design, and choice of brass alloy also made the brass insert fittings
13 susceptible to premature failure through stress corrosion cracking and/or
14 dezincification.

15     46.    Defendants knew or should have known that the manufacturing process
16 used for the brass insert fittings left residual stress and machining imperfections that
17 would cause premature failure through stress corrosion cracking and/or
18 dezincification.

19     47.    The design, materials choices, and manufacturing practices of the brass
20 fittings marketed and sold by Defendants have created a product that is damaged and
21 begins to fail on its first day of use, even if perfectly installed in its intended
22 environment.

23     48.    Because of their defective design and manufacture, Defendants' F1807
24 brass insert fittings failed in their intended purpose.

25     49.    Because of their defective design and manufacture, Defendants' F1807
26 brass insert fittings are inherently defective and are substantially certain to fail
27 within the express warranty provided with the fittings and/or the useful life of the

28

1  fittings.

2      50.    Plaintiff and Class members own, have installed, or have paid for

3  damages caused by Uponor and RTI plumbing systems with brass insert fittings that

4  have already or are in the process of failing prematurely and thus have suffered or

5  are reasonably certain to suffer actual injury well in advance of the warranted and

6  expected life of their plumbing systems.

7  **Defendants' Admissions of Defect**

8      51.    Although they never told consumers, plumbers, or plumbing

9  distributors that they were not the designers and manufacturers of the fittings,

10  Defendants now claim that neither Uponor nor RTI actually designed or

11  manufactured the F1807 brass insert fittings they sold to consumers. Defendants

12  instead purchased the fittings from foreign companies, including Unique Industrial

13  Product Company ("Unique Industrial").

14      52.    No later than 2006, Uponor and RTI began receiving reports that their

15  F1807 fittings were failing prematurely when used as intended.

16      53.    For example, Defendants received reports from NVR, a large national

17  homebuilder, that numerous F1807 fittings had failed prematurely in homes in the

18  State of Virginia.

19      54.    Uponor and/or RTI agreed to reimburse NVR for the cost of replacing

20  the fittings and/or plumbing systems in more than seven hundred homes. The cost of

21  those replacements totaled approximately $5 million.

22      55.    Defendants also received similar reports of prematurely failing F1807

23  fittings in Minnesota, Wisconsin, Washington, Oregon, Utah, Montana, Missouri,

24  Vermont, Iowa, Michigan, Louisiana, Idaho, Indiana, California and other of the

25  United States.

26      56.    As a result of the premature failures of the F1807 fittings, Defendants

27  stopped selling F1807 fittings. Uponor now only sells insert fittings manufactured to

28

1 | comply with ASTM F1960 or other ASTM standards.

2 |     57.    After deciding to stop selling the Plumb-Pex system, Uponor issued a
3 | confidential "talking points" memorandum to its employees and sales
4 | representatives. In that memo, Uponor explained the reasons it stopped selling the
5 | Plumb-Pex system. Uponor admitted the product design and quality was one of the
6 | reasons: "More importantly, the quality and design of the brass insert fitting used in
7 | the [Plumb-Pex system] does not measure up to Uponor's high quality standards."

8 |     58.    Knowing that these fittings were defective, Uponor allowed its
9 | distributors and contractors to return unused Plumb-Pex components for a complete
10 | refund in late 2006.

11 |     59.    At some point in 2006, Uponor sought reimbursement from Unique
12 | Industrial for the money Uponor paid as a result of premature failures of the F1807
13 | fittings.

14 |     60.    In seeking reimbursement from Unique Industrial, Uponor claimed that
15 | the F1807 fittings it and RTI had obtained from Unique Industrial, and which
16 | Uponor and RTI had sold to the public, were defectively designed or manufactured.

17 |     61.    Ultimately, Uponor sued Unique Industrial in federal court in Texas. In
18 | that complaint, Uponor admitted that the F1807 fittings were "defectively
19 | manufactured" and "were not merchantable, or suited for their reasonable, expected
20 | and intended use in residential plumbing systems, and which were not free from
21 | defects in materials, design and workmanship."

22 |     62.    Uponor also admitted in the complaint against Unique Industrial that
23 | the F1807 fittings were "defective and unreasonably dangerous." A copy of the
24 | Uponor Amended Complaint is attached as Exhibit A.

25 |     63.    In the course of its lawsuit against Unique Industrial for the premature
26 | failures of the F1807 fittings, Uponor retained the services of Cynthia L. Smith, an
27 | engineer and one of Uponor's former employees.

28 |

FIRST AMENDED COMPLAINT IN CLASS ACTION

64.     Ms. Smith issued reports and opinions in which she concluded that the F1807 fittings bought from Unique Industrial and sold by Defendants were defectively designed and manufactured. She concluded that the fittings were failing because of stress corrosion cracking that was the result of improper manufacturing practices and off-specification materials. A copy of Ms. Smith's report is attached hereto as Exhibit B.

65.     Ms. Smith also issued reports and opinions in which she concluded that the F1807 fittings sold by Defendants had not failed because of installation practices or water conditions. She so concluded after analyzing fittings that had never been installed -- i.e. were still in their original bag -- and yet displayed manufacturing, materials and other defects.

66.     Ms. Smith also issued reports and opinions in which she concluded that the F1807 fittings sold by Defendants had failed not because of water conditions and stated: "My conclusion that faulty installation was not a cause of failure in the brass fittings supplied by Unique Industrial was further supported by the history of fittings failures. A sudden rash of failures occurred in multiple states (where varying water chemistry conditions existed) during a narrowly defined time period, involving various plumbing contractors who had previous experience successfully installing these components. This fact also undermines any question of installation error."

67.     In the course of its lawsuit against the Unique Industrial, Uponor also submitted a report and opinion from engineer Thomas Eagar. Like Ms. Smith, Mr. Eagar also concluded that the fittings sold by RTI and Uponor were defectively manufactured. A copy of Mr. Eagar's report is attached as Exhibit C.

68.     Mr. Eagar concluded that the fittings had failed because of improper machining practices, improper alloy composition and microstructure.

69.     Like Ms. Smith, Mr. Eagar also concluded that the composition of many of the fittings failed to comply with the ASTM standards governing F1807

1 | fittings. Fittings that do not comply with that standard cannot be passed off and sold
2 | as being eligible for use in potable water systems in the United States.

3 | 70.  Mr. Eagar also concluded that inappropriately elevated finish hardness
4 | and other residual stress from manufacture had contributed to the premature failure
5 | of the fittings.

6 | 71.  In addition to these judicial admissions, Uponor now publicly criticizes
7 | the F1807 fitting design. In a document currently available on its website, Uponor
8 | compares its F1960 fittings with the F1807 style fitting both Defendants previously
9 | sold.

10 | 72.  In that product comparison, Uponor is critical of the thinner wall
11 | thickness of the F1807 fittings and states that: "Thinner wall offers less resistance to
12 | stress and corrosion." A copy of that advertisement is attached as Exhibit D.

13 | 73.  Uponor therefore itself now publicly criticizes the design flaws in the
14 | F1807 fittings and, as it did in its 2006 talking points memorandum, concedes that
15 | "the quality and design of the brass insert fitting used in the [Plumb-Pex system]
16 | does not measure up to Uponor's high quality standards."

17 | **Replacement of F1807 Fittings and Pex Systems**

18 | 74.  Recognizing that the F1807 fittings they sold were defective,
19 | Defendants have paid for or authorized the replumbing of certain properties
20 | containing those systems.

21 | 75.  For example, Defendants have paid for or authorized the replumbing of
22 | properties containing systems with F1807 fittings in the State of Virginia.

23 | 76.  In addition, Defendants have paid for or authorized the replumbing of
24 | properties containing systems with F1807 fittings in the State of Nevada. In that
25 | replumbing program, Defendants agreed to replumb all homes built by D.R. Horton
26 | in which Defendants' F1807 fittings are installed.

27 | 77.  In an October 2008 letter to homeowners, RTI advised homeowners "of
28 |

1  the risk that the plumbing system in your home may be susceptible to future leaks."
2  In that same letter, RTI offered to pay for complete repiping of plumbing systems
3  owned by the purchasers of D. R. Horton homes. A copy of the RTI letter is attached
4  as Exhibit E.

5       78.    Unfortunately, Defendants refuse to repipe or replumb the homes or
6  properties of all persons or entities who own systems with Defendants' F1807
7  fittings. Defendants instead apparently offer that work to only the customers of large
8  home builders, leaving other consumers without the benefit of the same
9  replacement.

10      79.    Defendants have refused the requests to of property owners to replumb
11 their home to replace the fittings Defendants themselves have admitted are
12 defective, unreasonably dangerous and not merchantable.

13 **Inadequate Testing of Brass Insert Fittings**

14      80.    Contrary to statements made in their advertising and marketing,
15 Defendants did not test and did not ensure that the F1807 brass insert fittings had
16 been tested in their anticipated environments before selling those fittings to the
17 public. Defendants also failed to require their suppliers to perform such testing.

18      81.    Defendants did not "end use" test the brass insert fittings in pex
19 plumbing systems and instead they or their suppliers used various assumptions when
20 choosing or specifying the design and materials for this system. Such a practice
21 violates engineering and manufacturing standards and accepted practice. Defendants
22 also failed to require their suppliers to perform such testing.

23      82.    Defendants and/or their suppliers also conducted inadequate testing on
24 their F1807 brass insert fittings and failed to test things that they knew or should
25 have known would lead to premature failure of the brass fittings. Defendants also
26 failed to require their suppliers to perform such testing.

27      83.    Defendants and/or their suppliers also failed to investigate or test

28

1  whether well-known and expected water conditions would lead to premature failure
2  of the brass insert fittings. Defendants also failed to require their suppliers to
3  perform such testing.

4  **Misleading Representations and Advertising of Pex Plumbing Systems**

5      84.    Defendants falsely advertised that their pex plumbing systems:
6  including their F1807 brass insert fitting components -- were reliable despite never
7  testing and determining the reliability of the product when used in real world
8  conditions.

9      85.    Defendants also falsely advertised that RTI had a long history in the
10 plumbing industry and falsely claimed that the Plumb-Pex system was proven,
11 reliable and the result of rigorous engineering and quality control.

12     86.    For example, on RTI's web site, www.radiant-tech.com, Defendants
13 advertised Radiant Technology in 1997 as company only in the business of selling
14 radiant heating systems. Yet the very next year in 1998, RTI began claiming on the
15 same web site that "Radiant Technology is a North American leader in the
16 manufacture of both plumbing and heating products." Defendants knew that this
17 statement was false and misleading because, among other things, RTI had just
18 started selling plumbing systems for potable water. In addition, Defendants knew
19 that they were not in fact manufacturing plumbing systems and knew that they were
20 not the manufacturer of the Plumb-Pex brass fittings. Defendants continued to make
21 these false statements on the www.radiant-tech.com web site until the fall of 2002.
22 They then continued to make the same or similar false statements on RTI's new web
23 site, www.rti-systems.com, until the fall of 2004 when they announced that RTI
24 would be closed.

25     87.    On RTI's web site, www.radiant-tech.com, Defendants falsely claimed
26 in 1998 that "Plumb-Pex is proven, reliable and completely safe for you and your
27 family." Defendants knew that this statement was false and misleading because,

28

1  among other things, RTI apparently did not do any engineering of the Plumb-Pex
2  system and instead simply bought the fittings from manufacturers located in Asia.
3  Defendants now claim that they did not design or manufacture the Plumb-Pex
4  fittings and had absolutely no idea whether this system was "reliable" as they
5  advertised to the public. In addition, this statement falsely claims that the Plumb-Pex
6  system, which had just been developed and had little or no track record in the field,
7  was "proven" or "reliable." Defendants continued to make these false statements on
8  the www.radiant-tech.com web site until at least the fall of 2002. They then
9  continued to make the same or similar false statements on RTI's new web site,
10 www.rti-systems.com, until the fall of 2004 when they announced that RTI would
11 be closed.

12      88.   On RTI's web site, www.radiant-tech.com, Defendants falsely claimed
13 in 1998 that "Our Plumb-Pex system is a carefully engineered flexible piping system
14 that provides a durable, proven, and guaranteed solution to all your plumbing needs.
15 RTI maintains the highest quality standards in the industry." Defendants knew that
16 this statement was false and misleading because, among other things, RTI apparently
17 did not do any engineering of the Plumb-Pex system and instead simply bought the
18 fittings from manufacturers located in Asia. Defendants now claim that they did not
19 design or manufacture the Plumb-Pex fittings and had absolutely no idea whether
20 this system was "carefully engineered" as they advertised to the public. In addition,
21 this statement falsely claims that the Plumb-Pex system, which had just been
22 developed and had little or no track record in the field, was "proven" or "durable."
23 In addition, RTI knew it did not have "the highest quality standards in the industry"
24 when it did no quality control on the fittings in question. Defendants continued to
25 make these false statements on the www.radianttech. com web site until at least the
26 fall of 2002. They then continued to make the same or similar false statements on
27 RTI's new web site, www.rti-systems.com, until the fall of 2004 when they

28

1 | announced that RTI would be closed.

2 | 　　　89.　　On 1998 RTI's web site, www.radiant-tech.com, Defendants falsely
3 | claimed that "With Radiant Technology's dedication to quality, you're assured of a
4 | long lasting and trouble free plumbing system." Defendants continued to make these
5 | false statements on the www.radiant-tech.com web site until at least the fall of 2002.
6 | They then continued to make the same or similar false statement on RTI's new web
7 | site, www.rti-systems.com, until the fall of 2004 when they announced that RTI
8 | would be closed. Defendants knew that this statement was false and misleading
9 | because, among other things, RTI did not do any quality control of the
10 | manufacturing process of the Plumb-Pex fittings and instead simply bought the
11 | fittings from third party manufacturers in Asia. Defendants therefore had no basis to
12 | represent that the quality standards used for the manufacture of the Plumb-Pex
13 | fittings would assure a long lasting and trouble free plumbing system. Defendants
14 | have since admitted in their lawsuit against Unique Industrial that Unique Industrial
15 | did not use acceptable quality standards and instead used substandard and
16 | unacceptable quality control and manufacturing processes.

17 | 　　　90.　　In November 2002, Defendants published a Plumb-Pex brochure they
18 | distributed to consumers and made available on the RTI web site,
19 | www.rtisystems.com. In that brochure, Defendants falsely claimed that the Plumb-
20 | Pex system was a "carefully engineered flexible piping system which provides a
21 | durable, proven, and guaranteed solution to all your plumbing needs." Defendants
22 | continued to distribute the same or similar statements in that brochure for at least
23 | several years. Defendants knew that this statement was false and misleading
24 | because, among other things, RTI apparently did not do any engineering of the
25 | Plumb-Pex system and instead simply bought the fittings from manufacturers in
26 | Asia. Defendants have since admitted that they did not design or manufacture the
27 | fittings used in this system and have absolutely no idea whether this system was

28 |

1 "carefully engineered" as they advertised to the public. In addition, this statement
2 falsely claims that the Plumb-Pex system, which had only been sold for a few years,
3 was "durable" and "proven."

4       91.    In November 2002, Defendants published a Plumb-Pex brochure they
5 distributed to consumers and made available on the RTI web site,
6 www.rtisystems.com. In that brochure, Defendants falsely claimed that "We have
7 the highest quality standards in the industry." Defendants continued to distribute the
8 same or similar statements in that brochure for at least several years. Defendants
9 knew that this statement was false and misleading because, among other things, RTI
10 did not do any quality control of the manufacturing process of the Plumb-Pex
11 fittings and instead simply brought the fittings from third party suppliers in Asia.
12 Defendants therefore had no basis to represent that the quality standards used for the
13 manufacture of the Plumb-Pex fittings were "the highest quality standards in the
14 industry." Defendants have since admitted in their lawsuit against Unique Industrial
15 that Unique Industrial did not use the highest quality standards in the industry and
16 instead used substandard and unacceptable quality control and manufacturing
17 processes.

18       92.    In November 2002, Defendants published a Plumb-Pex brochure they
19 distributed to consumers and made available on the RTI web site,
20 www.rtisystems.com. In that brochure, Defendants falsely claimed that "With RTI's
21 dedication to quality, you're assured of a long lasting and trouble free plumbing
22 system." Defendants continued to distribute the same or similar statements in that
23 brochure for at least several years. Defendants knew that this statement was false
24 and misleading because, among other things, RTI did not do any quality control of
25 the manufacturing process of the Plumb-Pex fittings and instead simply bought the
26 fittings manufacturers in Asia. Defendants therefore had no basis to represent that
27 the quality standards used for the manufacture of the Plumb-Pex fittings would
28

1   assure a long lasting and trouble free plumbing system. Defendants have since
2   admitted in their lawsuit against Unique Industrial that Unique Industrial did not use
3   acceptable quality standards and instead used substandard and unacceptable quality
4   control and manufacturing processes.

5         93.    Beginning no later than 2003, the "Who we are" section of the RTI web
6   site, www.rtisystems.com falsely claimed that "Our Radiant Technology Heating
7   and Plumb-Pex Plumbing Systems are a result of over 20 years of experience and
8   are backed by RTI's steadfast commitment to quality, product innovation,
9   engineering and manufacturing technology." Defendants continued to make this
10  statement on that site for at least several years. Defendants knew that this statement
11  was false and misleading because, among other things, the Plumb-Pex system was
12  new and had not been in existence for 20 years. Nor did RTI have 20 years' of
13  experience in the plumbing industry. Defendants also knew that this statement was
14  false and misleading because RTI did not do any quality control of the
15  manufacturing process of the Plumb-Pex fittings and instead simply bought the
16  fittings from manufacturers in Asia. Defendants therefore had no basis to represent
17  that the quality and engineering standards used for the manufacture of the Plumb-
18  Pex fittings were acceptable or of high quality. Defendants have since admitted in
19  their lawsuit against Unique Industrial that Unique Industrial did not use acceptable
20  quality standards and instead used substandard and unacceptable quality control and
21  manufacturing processes.

22        94.    Beginning no later than 2003, the "Who we are" section of the RTI web
23  site, www.rtisystems.com falsely claimed that "All RTI products undergo thorough
24  testing to pass not only our strict quality standards, but to assure that we exceed
25  those set by independent quality assurance agencies both in America and abroad."
26  Defendants continued to make this statement on that site for at least several years.
27  Defendants knew that this statement was false and misleading because, among other

28

1  things, because RTI did not do any quality control of the manufacturing process of
2  the Plumb-Pex fittings and instead simply bought the fittings through manufacturers
3  in Asia. Defendants therefore had no basis to represent that fittings had undergone
4  thorough testing to pass RTI's "strict quality standards." Defendants knew that they
5  did nothing to test the quality of the fittings and had no idea whether any testing or
6  quality assurance was being done by the suppliers of the fittings.

7      95.   Each of the false statements and misrepresentations made in the
8  preceding paragraphs were repeatedly restated by Defendants' sales personnel,
9  including but not limited to Frank Bilotta and David Holdorf, as well as Defendants'
10 manufacturer's representatives, in the course of virtually every sale of the brass
11 fittings at issue here. All of the sales and product literature provided by Defendants
12 falsely implied that the Plumb-Pex system was proven, reliable, time tested, and the
13 result of rigorous engineering and quality control practices. Defendants, however,
14 knew at the time these statements were provided to consumers, suppliers, and
15 contractors that the statements were false and unsupported.

16     96.   At all times and in all communications with consumers, suppliers and
17 contractors, Defendants and their representatives knowingly misrepresented RTI's
18 experience in the plumbing industry. Contrary to the statements referenced herein,
19 RTI was new to the potable water plumbing industry and had no experience in the
20 design, manufacture and quality control of potable water plumbing systems and the
21 brass fittings used for those systems.

22     97.   At all times and in all communications with consumers, suppliers and
23 contractors, Defendants and their representatives knowingly misled consumers into
24 believing that RTI and/or Uponor actually designed, manufactured and quality
25 controlled the Plumb-Pex system. In reality, Defendants knew that they had
26 delegated all of those tasks to foreign manufacturers without any oversight by
27 Defendants about the materials selections and manufacturing practices used to make
28

1  the brass insert fittings used in those systems.

2      98.    The falsity of Defendants' representations set out above can be seen

3  from Defendants' judicial admissions. For example, Uponor states in its Amended

4  Complaint in its lawsuit against Unique Industrial that: "Unique Industrial selected

5  Duksan Metal Co. of Korea to design, engineer and manufacture the Fittings.

6  Neither RTI nor Uponor participated in the selection of Duksan nor did they have

7  contact with Duksan relating to the means, methods or circumstances regarding the

8  manufacture of the fittings."

9      99.    The falsity of Defendants' representations set out above can be seen

10  from Defendants' judicial admissions. For example, Uponor states in its Amended

11  Complaint in its lawsuit against Unique Industrial that Unique Industrial:

12      a)    defectively manufactured the subject Fittings;

13      b)    failed to take reasonable steps to ensure that the Fittings
14            would not be subject or prone to fracturing post-
              manufacture in expected and intended residential use;

15                                * * *

16      d)    failed to properly test, inspect and evaluate the Fittings . . .
17            prior to distributing those products to determine that they
              were suitable and fit for installation in residential
18            plumbing systems;

19      e)    supplied RTI and UPONOR with . . . Fittings that were
              not merchantable, or suited for their reasonable, expected
20            and intended use in residential plumbing systems, and
              which were not free from defects in materials, design and
21            workmanship;

                                  * * *
22

23      g)    failed to supply Fittings that complied with ASTM
              standard F1807 and the chemical composition
24            requirements specified in the attachments thereto;

25  See Exhibit A attached hereto. These admissions about the engineering, quality

26  control, and compliance with ASTM standards starkly contrast the false statements

27  made by Defendants to sell the Plumb-Pex systems.

28

1     100.  At all times and in all communications with consumers, suppliers and
2 contractors, Defendants and their representatives knowingly misled consumers into
3 believing that the Plumb-Pex system was designed, manufactured and quality
4 controlled in the United States. In reality, Defendants knew that they had sourced all
5 of those tasks to foreign manufacturers without any oversight by Defendants about
6 the materials selections and manufacturing practices used to make the brass insert
7 fittings used in those systems.

8     101.  At all times and in all communications with consumers, suppliers and
9 contractors, Defendants and their representatives knowingly misled consumers into
10 believing that the Plumb-Pex system was designed, manufactured and quality
11 controlled in the United States by virtue of Defendants' placement of a stamp on
12 those fittings that read "US-PW." Defendants knew and intended that such a stamp
13 would mislead U.S. consumers into believing that the fittings were manufactured in
14 the United States for use in potable water ("PW") systems. Defendants did this to
15 conceal the fact that they did not in fact manufacture the fittings and that they had
16 instead purchased the fittings cheaply from Asia and instructed that the
17 manufacturers in Korea and Taiwan affix these stamps to the fittings.

18     102.  Plaintiffs and their representatives believed, based on Defendants'
19 representations, that Defendants designed, manufactured and quality controlled the
20 Plumb-Pex fittings. Plaintiffs and their representatives would not have purchased or
21 used Plumb-Pex fittings if they had known the truth about who designed,
22 manufactured and quality controlled the fittings.

23     103.  When Defendants and their representatives made each of the
24 affirmative misrepresentations outlined above, Defendants knew the representations
25 were false and/or misleading. Defendants and their representatives intended that
26 consumers and purchasers of the Plumb-Pex system would rely on the false and
27 misleading statements. The plumber that installed the plumbing system at Plaintiffs'
28

1 | home in fact received and relied on such representations in its decision to purchase
2 | and install Defendants' Plumb-Pex plumbing systems.

3 |     104. Defendants also falsely stated in their advertising brochures and web
4 | site listings that the brass insert fittings used in the Plumb-Pex systems complied
5 | with ASTM F1807. For example, the April 2003 Plumb-Pex Plumbing Systems
6 | Design and Installation brochure states that "Plumb-Pex fittings are manufactured of
7 | solid brass to ASTM F-1807 *Metal Insert Fittings*" specifications. Other literature
8 | produced by Defendants makes similar representations and similar representations
9 | were repeatedly made throughout the years on Defendants' www.radianttech. com
10 | and www.rti-systems.com web sites.

11 |     105. In addition to the representations made in their advertising materials
12 | and on their web sites, every one of the brass insert fittings sold by Defendants had a
13 | stamp on the side of the fitting which indicated that the fittings conformed to ASTM
14 | F877 and ASTM F1807. When a product or packaging is marked with the ASTM
15 | designation F1807, the product is represented to have been manufactured, tested,
16 | inspected and sampled in accordance with F1807 and has been found to meet F1807
17 | requirements.

18
19
20
21
22
23
24
25
26
27
28

FIRST AMENDED COMPLAINT IN CLASS ACTION

106. Defendants' fittings, however, did not comply with various aspects of the F1807 requirements including alloy composition and dimensions. Defendants knew or should have known that their advertising statements about compliance with ASTM standards were false. Defendants knew or should have known that their certification of compliance with ASTM standards by stamping those designations on the fittings were false.

107. At all times and in all communications with consumers, suppliers and contractors, Defendants and their representatives knowingly misled consumers into believing that the brass insert fittings in their Plumb-Pex system complied with ASTM standards. Plaintiffs, their representatives and other consumers relied on these misrepresentations because the Plumb-Pex fittings could not have been used in potable water systems in the United States without compliance with those standards. Defendants, therefore, passed off brass fittings as being of a particular quality, standard or grade that they were in fact not.

108. Contrary to their representations about the fittings having been manufactured, tested, inspected and sampled in accordance with F1807, Uponor's experts Ms. Smith and Mr. Eagar have concluded that the Plumb-Pex fittings failed to meet F1807 requirements.

109. Defendants also falsely represented that owners of their pex plumbing systems "can rest assured that your new plumbing . . . system will provide a lifetime of reliable service."

110. Defendants also falsely advertised and represented that their pex plumbing systems and their F1807 brass insert fittings had been subject to decades of "rigorous testing . . . and testing and testing and testing."

111. Defendants also falsely marketed their pex plumbing systems as being safe, reliable, and corrosion-resistant.

112. Defendants also falsely marketed and warranted their pex plumbing

1 | systems as being extensively tested, and that based on the results of those tests, the
2 | pex plumbing system and their F1807 brass insert fittings were properly designed,
3 | developed, marketed, and manufactured so as to perform adequately, reliably and as
4 | represented.

5 |     113.  Defendants also falsely marketed and warranted that their pex
6 | plumbing systems were superior to copper plumbing systems.

7 |     114.  Defendants also falsely marketed and warranted that their pex
8 | plumbing systems and the F1807 brass insert fittings were of superior design and
9 | materials than similar products made by competitors.

10 |     115.  When Defendants and their representatives made each of the
11 | affirmative misrepresentations outlined above, Defendants knew the representations
12 | were false and/or misleading. Defendants and their representatives intended that
13 | consumers and purchasers of the Plumb-Pex system would rely on the false and
14 | misleading statements.

15 |     116.  Defendants and their authorized agents and distributors made each of
16 | the above described assertions, statements, representations and warranties with the
17 | intent and purpose of inducing plumbing suppliers, builders, plumbers, and
18 | consumers to purchase and install pex plumbing systems and their F1807 brass
19 | insert fittings in their properties throughout the country.

20 | **Defendants' Omissions About the Quality of Their Plumb-Pex Fittings**

21 |     117.  Defendants also made numerous material omissions and uniformly
22 | withheld important information relating to the design, reliability and performance of
23 | their brass insert fittings and pex plumbing systems.

24 |     118.  Among these omissions were the failure to inform purchasers and
25 | consumers about the tendency for these fittings to fail because of stress corrosion
26 | cracking or dezincification and to inform them that Defendants and their suppliers
27 | had done little or no testing to determine whether these fittings and the systems in
28 |

which they were used would perform well in real world conditions.

119.  Defendants also omitted material information about the limitations of the high zinc content yellow brass fittings including, for example, that the published literature going back as far as the 1940's had shown the propensity of that type of brass to crack in even pure water.

120.  Defendants also omitted material information about the limitations of the high zinc content yellow brass fittings including, for example, that the propensity of that type of brass to crack exponentially increases following rough machining or finish practices like those used by Defendants and/or their suppliers.

121.  Defendants also omitted material information from consumers about their lack of quality control or input about the design and manufacturing practices used to make the Plumb- Pex fittings.

122.  Defendants also omitted material information from consumers including the fact that Defendants had completely delegated the design, manufacture and quality control of the Plumb-Pex fittings to others, including foreign manufacturers located in Asia or elsewhere.

123.  Defendants also omitted material information about their belief that "the quality and design of the brass insert fitting used in the [Plumb-Pex system] does not measure up to Uponor's high quality standards."

124.  Defendants also omitted material information from consumers about the country of origin and origin of the design and manufacture of the Plumb-Pex fittings.

125.  Defendants also omitted material information from consumers about the availability of materials that were more resistant to stress corrosion cracking than the high zinc content yellow brass used to make the Plumb-Pex fittings.

126.  Defendants also omitted material information from consumers about RTI's lack of experience in the plumbing industry and the fact that it had never

1  manufactured or sold pex plumbing products before it began selling the Plumb-Pex
2  system.

3       127.   Each of the omissions made in the preceding paragraphs were
4  repeatedly made by Defendants' sales personnel, including but not limited to Frank
5  Bilotta and David Holdorf, as well as Defendants' manufacturer's representatives, in
6  the course of virtually every sale of the brass fittings at issue here. All of the sales
7  and product literature provided by Defendants, Defendants' web sites, and their
8  sales presentations all omitted the material facts recited herein. Defendants never
9  disclosed the true facts they omitted as described above.

10      128.   Had Defendants not withheld and omitted this material information
11  about the design, reliability and performance of their F1807 brass insert fittings and
12  pex plumbing systems, Plaintiffs, their representatives and the members of the
13  putative class would not have purchased those products, allowed them to be installed
14  in their homes or properties, or purchased homes and properties with such systems.

15  **Field Failures of Defendants' Pex Plumbing systems**

16      129.   By 2006 at the latest, Defendants received notice that their brass insert
17  fittings were failing prematurely.

18      130.   Defendants' brass insert fittings have failed prematurely in numerous
19  locations throughout the United States, including Arizona, Florida, Minnesota,
20  Virginia, Washington, Wisconsin, Oregon, Utah, Montana, Missouri, Vermont,
21  Iowa, Michigan, Louisiana, Idaho, California and Indiana.

22      131.   Defendants analyzed the cause of these failures and concluded that the
23  fittings were failing because of stress corrosion cracking and/or dezincification.

24      132.   To-date, Defendants have received hundreds of warranty claims for the
25  failed F1807 style fittings.

26      133.   Because of these failures, Defendants have completely stopped selling
27  F1807 style fittings.

28

134.   In recognition of the problems with its choice of high zinc content brass, Uponor now offers different materials for use in its pex plumbing fittings.

**Plaintiffs' Circumstances**

135.   Plaintiffs own a home in Temecula, California that has a pex plumbing system sold through Defendants' authorized distributors. That pex plumbing system used the brass fittings marketed and sold by Defendants and described herein.

136.   The fittings in Plaintiffs' home are stamped with both "MB pex" and "P pex" designations. The plumbing system uses Uponor pex piping throughout the home.

137.   In mid-January 2010, one of the F1807 fittings sold by Defendants catastrophically failed at Plaintiffs' home, causing damage to property other than the pex plumbing system. The failure caused extensive damage to Plaintiffs' home and property.

138.   Numerous other homes in Plaintiffs' neighborhood have had F1807 fittings leak and cause property damage.

139.   Because of problems with the brass fittings in their home and in their neighborhood, Plaintiffs asked Uponor to replace all Uponor / RTI fittings that remained in their home. Uponor did not respond to that request, leaving Plaintiffs with brass fittings in their home that Defendants have conceded are defective, unreasonably dangerous and not merchantable and which are destined to fail in the future.

140.   Plaintiffs, like many class members, have already suffered out-of-pocket damage to repair their home or the properties of others following the premature failures of Defendants' brass insert fittings. Likewise, all putative class members have incurred or are reasonably certain to incur, the cost of repairing their homes because of fittings failures and/or prematurely replacing their plumbing systems.

1       141.  Plaintiffs and the proposed class members suffered general and specific

2  compensatory and contractual damages including, without limitation consequential,

3  incidental, loss of use, diminution of value, attorneys' fees, costs and disbursements.

4                    **DEFINITION OF PROPOSED CLASSES**

5       142.  Plaintiffs bring this class action on behalf of themselves and all others

6  similarly situated, for all claims alleged herein, pursuant to Rule 23 of the Federal

7  Rules of Civil Procedure. The first proposed class, applicable to Counts III, IV, and

8  V of this First Amended Complaint, is defined as:

9

10         All persons and entities in the State of California that own a structure
            that contains a potable water pex plumbing system with F1807 brass
11       insert fittings sold by Uponor or RTI.

12         The proposed class includes, without limitation, all such persons or
            entities who contacted Defendants or their representatives about their
13       pex plumbing system and were denied or partially denied warranty
            coverage and /or replacement of their pex plumbing system.
14

15       143.  The second proposed class, applicable to only Counts I, II, III, IV, and

16  V of this First Amended Complaint, is defined as:

17         All persons and entities in the State of California that own a structure
            that contains a potable water pex plumbing system with F1807 brass
18       insert fittings sold by Uponor or RTI and who have sustained damage
            to property other than the Uponor and RTI system as a result of leaks of
19       that system.

20         The proposed class includes, without limitation, all such persons or
            entities who contacted Defendants or their representatives about their
21       pex plumbing system and were denied or partially denied warranty
            coverage and /or replacement of their pex plumbing system.
22

23       144.  Plaintiffs specifically exclude Defendants or their related entities from

24  the putative class, all subsidiaries or affiliates of Uponor; any entity in which

25  Defendants have a controlling interest; and any and all of Defendants' employees,

26  affiliates, legal representatives, heirs, successors or assignees.

27       145.  Plaintiffs also specifically exclude from the putative class any person or

28

entity that has previously commenced and concluded a lawsuit against Defendants arising out of the subject matter of this lawsuit.

146.   Plaintiffs also specifically exclude from the putative class the judge assigned to this case and any member of the judge's immediate family.

147.   Plaintiffs specifically include in the putative class the claims of all persons or entities, like insurance companies, that have paid for the repair, replacement and/or damage caused by prematurely failed brass insert fittings sold by Defendants.

## SATISFACTION OF CLASS PREREQUISITES

148.   This class action satisfies numerosity, commonality, typicality, adequacy and superiority requirements for maintaining a class.

149.   **Numerosity.** Pursuant to Rule 23(a)(1) of the Federal Rules of Civil Procedure, the putative class "is so numerous that joinder of all members is impracticable." The number of members of the putative class is believed to be tens of thousands of individuals and/or entities that own properties with Defendants' pex plumbing systems with F1807 brass insert fittings.

150.   Joinder of the persons and entities into whose properties the Defendants' pex plumbing systems were installed is impractical and not feasible.

151.   **Commonality.** Pursuant to Rule 23(a)(2) of the Federal Rules of Civil Procedure, the putative class shares "questions of law or fact" that predominate and individualized issues. The common questions include, but are not limited to, the following:

- Were Defendants' brass insert fittings defectively designed for their intended application?
- If so, what is the nature of the design defect?
- Were Defendants' brass insert fittings defectively manufactured?
- Did Defendants fail to warn consumers that the brass insert fittings were not properly tested during design and development process?
- Did Defendants adequately warn consumers about any types of

installations that may cause premature failure of the brass insert fittings?

• Did Defendants make fraudulent, false, deceptive and/or misleading statements in connection with the sale of pex plumbing systems in their product literature, including those relating to standards and reliability?

• Did Defendants omit material information when they sold their pex plumbing systems and F1807 brass insert fittings?

• Did Defendants properly account for foreseeable variations in installation in the development and design of their pex plumbing system and brass insert fittings?

• Did Defendants exercise reasonable care in the design, manufacture and testing of their pex plumbing system and F1807 brass insert fittings?

• Are the brass insert fittings progressively deteriorating at an accelerated rate?

• Will the brass insert fittings fail prematurely?

• Did Defendants deliberately sell or allow brass insert fittings to be distributed after they knew the fittings were failing at an increased rate?

• What categories of damages are recoverable for owners of structures with Defendants' pex plumbing systems and brass insert fittings, e.g., replacement, consequential, incidental or other damages?

• Are Plaintiffs entitled to relief under Defendants' express warranty?

• Can the class obtain a declaration concerning the types and categories of damages and remedies available to putative class members?

• Should Defendants be enjoined from denying warranty claims based on alleged warranty disclaimers or limitations?

• Are Plaintiffs' claims barred in whole or in part by any of Defendants' affirmative defenses?

152.   **Typicality.** Pursuant to Rule 23(a)(3) of the Federal Rules of Civil Procedure, the claims of the putative class representatives, Plaintiffs, "are typical of the claims of the class." Plaintiffs and all members of the putative class who own Defendants' defective pex plumbing systems with F1807 brass insert fittings have suffered damages as a result of Defendants' wrongful acts and misconduct. Pursuant to corporate directives, Defendants engaged in a similar pattern of misconduct

1 | towards both the Plaintiffs and all the other putative class members.

2 |      153.  **Adequacy**. Pursuant to Rule 23(a)(4) of the Federal Rules of Civil
3 | Procedure, the putative class representatives "will fairly and adequately protect the
4 | interests of the class." Plaintiffs have no adverse interests to the putative class
5 | members. Plaintiffs were sold or installed plumbing systems with defective brass
6 | insert fittings. Plaintiffs have retained lawyers who have substantial resources,
7 | experience and success in the prosecution and defense of class action, mass tort and
8 | complex litigation, and the insurance coverage and settlement issues attendant to the
9 | same.

10 |      154.  **Superiority.** Pursuant to Rule 23(b)(3) of the Federal Rules of Civil
11 | Procedure, a class action is a superior method of resolving this action for the
12 | following reasons: A class action in this instance conserves the resources of the
13 | putative class, Defendants and the Court. The damages of most putative class
14 | members are not, in isolation, significant enough to hire an attorney on a
15 | contingency basis, and the burden and expense of hiring an attorney on a per diem
16 | basis for Plaintiffs and most putative class members, makes it difficult if not
17 | impossible for the class members to seek redress. On information and belief, no
18 | Attorney General of any state has brought an enforcement action against Defendants
19 | to remedy the claims asserted herein. Because the nature of the claims involved, the
20 | class members need swift and uniform resolution of their claims before additional
21 | damage is caused by plumbing system failures. Defendants have refused to pay
22 | Plaintiffs and the putative class members their full damages. Further, there are or
23 | will be other cases pending against Defendants. Serial adjudications in numerous
24 | venues are not efficient, timely, or proper. Judicial resources would be unnecessarily
25 | depleted by resolution of individual claims. Joinder on an individual basis of
26 | thousands of claimants in any one suit would be impractical or impossible.
27 | Individualized judgments and rulings could result in inconsistent relief for similarly
28 |

1  situated plaintiffs. Individualized lawsuits could also establish incompatible
2  standards of conduct for Defendants in creating, marketing, sale and post-sale
3  conduct in connection with their pex plumbing systems and brass insert fittings.

### COUNT I

### (NEGLIGENCE)

6  155.  Plaintiffs and the putative class members reallege the foregoing
7  paragraphs, inclusive, as though fully set forth herein.

8  156.  Defendants were negligent in that they failed to use reasonable care
9  when they created, marketed and sold their pex plumbing systems with F1807 brass
10 insert fittings.

11 157.  As the manufacturer and/or seller of consumer products, Defendants
12 owed a duty to Plaintiffs and the putative class members to provide a safe and
13 quality product, and a duty to provide a product that would perform as it was
14 advertised. Defendants breached those duties.

15 158.  That as a direct and proximate result of Defendants' negligence, lack of
16 care, and other wrongful acts, Plaintiffs and the putative class members sustained
17 and will sustain damages.

18 159.  As a result of Defendants' negligence, Plaintiffs and the putative class
19 have suffered actual damages in that they have purchased and installed in their
20 homes and structures, or the homes and structures of their customers, a plumbing
21 system that is defective and is damaged upon its initial use.

22 160.  As a result of Defendants' negligence, Plaintiffs and the putative class
23 will suffer damages that include not only the full cost to replace brass insert fittings
24 and plumbing systems, but also include, without limitation, consequential and
25 incidental damages.

26 161.  That as a direct, proximate and foreseeable result of Defendants'
27 negligence, Plaintiffs and the putative class members have been damaged, in the

28

FIRST AMENDED COMPLAINT IN CLASS ACTION

1  aggregate, in an amount to be determined at trial.

2  **COUNT II**

3  **(NEGLIGENT FAILURE TO WARN)**

4  162.  Plaintiffs and the putative class members re-allege the foregoing
5  paragraphs, inclusive, as though fully set forth herein.

6  163.  As the manufacturer and seller of a consumer product, Defendants had
7  a duty to provide instructions for proper use of their products.

8  164.  As the manufacturer and seller of a consumer product, Defendants had
9  a duty to warn of foreseeable dangers inherent in the proper use of their products
10  and also had a duty to warn of dangers associated with foreseeable misuse of their
11  products.

12  165.  Defendants became aware through various claims and reports that the
13  brass insert fittings they were selling, distributing and advertising were subject to
14  premature failures, problems and deterioration.

15  166.  Despite the fact that Defendants knew their product was defective and
16  that their pex systems would not perform as advertised, warranted or otherwise
17  expressly represented, Defendants continued to sell the products to the public
18  without correction and, in fact, concealed from the public the fact that their pex
19  system and brass insert fittings were defective, not durable and would begin to fail
20  immediately upon being placed into service.

21  167.  Because the pex plumbing systems related to the habitability of
22  persons' homes, Defendants had a duty to the consumer and to the public to disclose
23  the defective nature of their system and not to conceal and suppress the defective
24  nature of the product from Plaintiffs and the putative class members.

25  168.  Defendants, however, have engaged in a scheme to cover up the true
26  nature of the problem with their brass insert fittings and plumbing systems. This
27  scheme included the concealment of Defendants' marking as "confidential" their

28

1  2006 talking points memorandum which concedes that "the quality and design of the
2  brass insert fitting used in the [Plumb-Pex system] does not measure up to Uponor's
3  high quality standards." This scheme also includes Uponor's attempts to keep
4  information about its admissions of the defective nature of the fittings out of the
5  public domain by trying to seal court files and by engaging in replumbing programs
6  for some large home builders utilizing secured web sites and other methods of
7  communication to preclude others from learning about the problems with the Plumb-
8  Pex systems.

9      169.  To this day, Defendants continue in this pattern of concealment and
10 suppression by deliberately and knowingly misrepresenting to the public the true
11 nature of the problems with the brass insert fittings. In fact, many members of the
12 putative class are still unaware that their plumbing system is prematurely failing and
13 will continue to fail due to its design and manufacturing defects.

14     170.  That to the extent Defendants claim in this lawsuit -- contrary to their
15 prior judicial admission -- that the premature failures of their plumbing systems and
16 brass insert fittings was the result of characteristics of the water chemistry present in
17 Plaintiffs or the members of the putative class's water supply, Defendants failed to
18 warn of those characteristics or dangers. As the manufacturer, seller and distributor
19 of consumer products, Defendants had a duty to provide such information.

20     171.  That to the extent Defendants claim in this lawsuit – contrary to their
21 prior judicial admissions -- that the premature failures of their plumbing systems and
22 brass insert fittings was the result of characteristics of the water chemistry present in
23 Plaintiffs or the members of the putative class's water supply, Defendants failed to
24 provide Plaintiffs and members of the putative class with any instructions,
25 information or warnings about the types of water conditions likely to cause
26 premature failures. As the manufacturer and seller of consumer products,
27 Defendants had a duty to provide such information.

28

1    172.   That as a direct, proximate and foreseeable result of Defendants' failure
2    to warn, Plaintiffs and the proposed members of the class suffered damage.

3    173.   As a result of Defendants' failure to warn, Plaintiffs and the putative
4    class have suffered actual damages in that they have purchased and installed in
5    homes and structures a plumbing system that is defective and that has caused
6    damage to property other than the system itself and that is damaged upon its initial
7    use.

8    174.   As a result of Defendants' failure to warn, Plaintiffs and the putative
9    class will suffer damages that include not only the full cost to replace their plumbing
10   systems and brass insert fittings, but also include, without limitation, consequential
11   and incidental damages.

12   175.   That as a direct, proximate and foreseeable result of Defendants'
13   negligence, Plaintiffs and the putative class members have been damaged, in the
14   aggregate, in an amount to be determined at trial.

15                              **COUNT III**
16                 **(BREACH OF EXPRESS WARRANTIES)**

17   176.   Plaintiffs and the putative class members re-allege the foregoing
18   paragraphs, inclusive, as though fully set forth herein.

19   177.   Defendants made certain express warranties to distributors, plumbers
20   and consumers about the goods they would provide.

21   178.   The express warranties provided by Defendants included warranties
22   that Defendants would provide properly designed and manufactured plumbing
23   systems and a lengthy warranty on such systems. Defendants also made numerous
24   other express warranties as previously set forth in this Complaint.

25   179.   Plumbing distributors, plumbers, Plaintiffs and the putative class
26   members relied upon Defendants' express warranties.

27   180.   Defendants breached such express warranties by providing defective

28

1 | plumbing systems that have or are reasonably certain to fail well before the
2 | warranted or useful life of the system. Defendants also breached their warranties to
3 | Plaintiffs and the putative class by refusing to honor their express warranties when
4 | presented with claims and damage covered by the terms of the warranty.

5 |     181. Defendants also breached such express warranties by refusing to
6 | replumb Plaintiffs' home and the properties of other members of the putative class.

7 |     182. That as a direct, proximate and foreseeable cause of Defendants' breach
8 | of express warranty, Plaintiffs and the putative class members sustained damages, in
9 | the aggregate, in an amount to be determined at trial.

10 | <center>**COUNT IV**</center>

11 | <center>**(BREACH OF IMPLIED WARRANTIES)**</center>

12 |     183. Plaintiffs and the putative class members reallege the foregoing
13 | paragraphs, inclusive, as though fully set forth herein.

14 |     184. At the time Defendants sold their pex systems, Defendants impliedly
15 | warranted that: (1) those systems were fit for use as a potable water plumbing
16 | system; (2) that the pex systems and their components were superior to traditional
17 | copper plumbing systems; and (3) that the pex systems would pass without objection
18 | in the industry.

19 |     185. The foregoing warranties were intended and made for the benefit of
20 | Plaintiffs, members of the Class and the future owner of any of Defendants' pex
21 | systems.

22 |     186. Defendants have breached these implied warranties by selling pex
23 | systems that were not fit for use in potable water systems, were not superior to
24 | copper plumbing systems, and were designed and manufactured in a way and using
25 | materials that were not acceptable to the plumbing and home construction industry.

26 |     187. That as a direct, proximate and foreseeable cause of Defendants' breach
27 | of express warranty, Plaintiffs and the putative class members sustained damages, in

28 |

the aggregate, in an amount to be determined at trial.

## <u>COUNT V</u>

### (DECLARATORY AND INJUNCTIVE RELIEF)

188.   Plaintiffs and the putative class members reallege the foregoing paragraphs, inclusive, as though fully set forth herein.

189.   Pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure and any applicable statute or rule providing for declaratory and/or injunctive relief, Plaintiffs and the putative class members seek a declaratory judgment as follows:

a.   To the extent Defendants allege that any pretend limitations, restrictions or disclaimers of express warranty preclude full recovery of damages, the warranties fail of their essential purpose because the remaining remedies provided therein are inadequate and deprive the class of the benefit of the bargain of their purchases, because Defendants at the time of sale and thereafter concealed and suppressed that the systems were defective, and because the provisions are otherwise unconscionable;

b.   To the extent Defendants allege that any pretend limitations, restrictions or disclaimers of express warranty preclude full recovery of damages, the same is unconscionable because the warranties do not provide adequate remedies because the defect in the plumbing systems is latent and because the Plaintiffs lack sufficient bargaining power;

c.   To the extent Defendants allege that any pretend limitations, restrictions or disclaimers of implied warranty preclude full recovery of damages, the same is unlawful and unenforceable;

d.   To the extent Defendants allege that any pretend limitations, restrictions or disclaimers of implied warranty preclude full recovery of damages, the same is barred by Defendants' failure to provide the alleged warranty disclaimers at the time of sale of the product;

e.   Any releases obtained by Defendants, that did not otherwise provide full compensation to the putative class, were fraudulently induced, are unconscionable, were obtained by suppression and concealment, were obtained under duress by persons needing to repair their plumbing systems, and are null and void; and

f.   To the extent Defendants have had an adverse adjudication against them arising from the subject matter of this Complaint, that the putative class may use offensive collateral estoppel against Defendants for the rulings and determinations therein.

1

# **PRAYER FOR RELIEF**

2

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly

3

situated, pray for relief against Defendants as follows:

4

    1.    Certification of this matter as a class action and appointing Plaintiffs

5

and their counsel to represent the class;

6

    2.    Compensation for damages suffered by Plaintiffs and the putative class

7

members;

8

    3.    Award of reasonable attorneys' fees and costs and disbursements

9

incurred herein;

10

    4.    Enjoin Defendants from denying warranty claims for failed brass insert

11

fittings;

12

    5.    Declaring the rights and obligations of the parties as prayed for; and

13

    6.    Such other and further relief the Court deems just and equitable.

14

15

# **JURY TRIAL DEMAND**

16

Plaintiffs hereby demand a jury trial for all individual and Class claims so

17

triable.

18

19

20

DATED: April 5, 2011          GREENBERG & RUDMAN LLP

21

22

                        By:_____

23

                          David H. Greenberg
                          Attorneys for Plaintiffs, Carl Fielstra

24

                          III and Krystal Fielstra, on behalf of
                          themselves and all others similarly
                          situated

25

26

27

28

- 37 -

# ADDITIONAL COUNSEL FOR PLAINTIFFS

Shawn M. Raiter
**LARSON · KING, LLP**
2800 Wells Fargo Place
30 East 7th Street
St. Paul, MN 55101
Telephone: (651)312-6500
Email: sraiter@larsonking.com

Robert K. Shelquist
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401-2197
Telephone: (612) 339-6900
Email: rshelquist@locklaw.com

Michael A. McShane
**AUDET & PARTNERS, LLP**
221 Main Street, Suite 1460
San Francisco, CA 94105-1906
Telephone: (415) 568-2555
Email: MMcShane@audetlaw.com

Charles J. LaDuca
**CUNEO GILBERT & LADUCA, LLP**
507 C Street, N.E.
Washington, DC 20002
Telephone: (202) 789-3960
Email: CharlesL@cuneolaw.com

David L. Black
**PERKINS COIE LLP**
1899 Wynkoop Street, Suite 700
Denver, CO 80202-1043
Telephone: (303) 291-2309
Email: Dblack@perkinscoie.com

- 38 -

## PROOF OF SERVICE

### STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the county of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 6100 Wilshire Boulevard, Suite 1170, Los Angeles, California 90048.

On **April** ⑥ **, 2011**, I served the foregoing document described as **FIRST AMENDED COMPLAINT IN CLASS ACTION** on the interested parties in this action by placing a true copy thereof enclosed in a sealed envelope addressed to the interested parties listed on the attached Service List.

___ BY FAX, I served this on the interested parties at the facsimile number(s) listed on the attached Service List.

___ BY MAIL, I deposited said envelope with postage therein fully prepaid to be placed in the U.S. mail at Los Angeles, California.

I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

___ BY FEDERAL EXPRESS, I caused such envelope to be deposited for delivery by Federal Express to the offices of the addressee listed on the attached Service List.

___ BY PERSONAL SERVICE, I caused such envelope to be delivered by hand to the addressee listed on the attached Service List.

<u>XXX</u> BY E-MAIL, I caused such document to be delivered electronically to the interested parties at the email address(es) listed on the attached Service List.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on **April** ⑥ **, 2011**, at Los Angeles, California.

_____ | TAMEKA R. WHITE

## SERVICE LIST

### Carl Fielstra III, et al. vs. Uponor, Inc.
2:11-CV000575 PA/JCGx

Shawn M. Raiter
**LARSON · KING, LLP**
2800 Wells Fargo Place
30 East 7th Street
St. Paul, MN 55101
Telephone: (651)312-6500
Email: sraiter@larsonking.com

Charles J. LaDuca, Esq.
Brendan S. Thompson, Esq.
**CUNEO GILBERT & LADUCA, LLP**
507 C Street, N.E.
Washington, DC 20002
Telephone: (202) 789-3960
Email: CharlesL@cuneolaw.com
Email: BrendanT@cuneolaw.com

Robert K. Shelquist
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South,
Suite 2200
Minneapolis, MN 55401-2197
Telephone: (612) 339-6900
Email: rshelquist@locklaw.com

Michael A. McShane
**AUDET & PARTNERS, LLP**
221 Main Street, Suite 1460
San Francisco, CA 94105-1906
Telephone: (415) 568-2555
Email: MMcShane@audetlaw.com

Howard Lieber, Esq.
**GROTEFELD, HOFFMANN, SCHLEITER, GORDON & OCHOA, LLP**
311 South Wacker Drive, Suite 4500
Chicago, Illinois 60606
Telephone:   (312) 551-0200
Facsimile:    (312) 601-2402
Email:  HLieber@ghlaw-llp.com

PROOF OF SERVICE